## No. 11,134.

### EX PARTE HOMER A. PLESSY.

1. Act 111 of the Legislature of 1890, regulating accommodations of the races on railways, does not violate the thirteenth amendment of the United States Constitution, because such accommodations involve no badge of slavery or involuntary servitude which is the sole subject of that amendment. Civil Rights Cases, 109 U. S. 3.

2. A long line of decisions, State and federal, maintain that statutes or regulations enforcing the separation of the white and colored races in public conveyances and in public schools, so long at least as the facilities or accommodations provided are substantially equal, do not abridge any privilege or immunity of citizens or otherwise contravene the fourteenth amendment of the United States Constitution.

3. In such matters, equality. and not identity or community, of accommodations is the extreme test of conformity to the requirements of the amendment.

4. The regulation of domestic commerce is as exclusively a State function as the regulation of interstate commerce is a federal function. This statute is an exercise of the police power and expresses the legislative conviction that the separation of the races in railway conveyances, with proper sanctions for substantial equality of accommodation, is in the interest of the public order, peace and comfort. It is a matter of legislative power and discretion with which courts can not interfere.

5. A proper construction of the statute does not (as contended by relator) authorize a conductor to assign a passenger to a coach to which his race does not belong; nor does it bind the passenger to accept such wrongful assign-

ment, nor exempt the officers or companies from actions for damages in case of such wrongful assignment and refusal to carry when disobeyed. The discretion vested in the conductor to decide primarily the coach to which each passenger belongs is only that necessary discretion attending every imposition of any duty to determine whether the circumstances, under which the duty arises, exist. He exercises such discretion at his peril and at that of his employer.

APPLICATION for Certiorari and Prohibition.

*Albion W. Tourgée* and *Jas. C. Walker* for the Relator.

*Lionel Adams* for the Respondent.

The opinion of the court was delivered by

FENNER, J. We have held that when a party is prosecuted for crime under a law alleged to be unconstitutional, in a case which is unappealable, and where a proper plea setting up the unconstitutionality has been overruled by the judge, a proper case arises for the exercise of our supervisory jurisdiction in determining whether the judge is exceeding the bounds of judicial power by entertaining a prosecution for a crime not created by law. State ex rel. Walker vs. Judge, 39 An. 132; State ex rel. Abbott vs. Judge, 44 An. 583.

Relator's application conforms to all the requirements of this rule. He alleges that he is being prosecuted for a violation of Act No. 111 of 1890; that said act is unconstitutional; that his plea of its unconstitutionality has been presented to, and overruled by, the respondent judge; and that the case is unappealable. He, therefore, applies for writs of certiorari and prohibition in order that we may determine the validity of the proceedings and, in case we find him entitled to such relief, may restrain further proceedings against him in the cause.

The judge, in his answer, maintains the constitutionality of the law and the validity of his proceeding.

The legislative act in question is entitled:

" An act to promote the comfort of passengers on railway trains; requiring all railway companies carrying passengers on their trains, in this State, to provide equal but separate accommodations for the white and colored races, by providing separate coaches or compart-

6

ments so as to secure separate accommodations; defining the duties of the officers of such railways; directing them to assign passengers to the coaches or compartments set aside for the use of the race to which such passengers belong; authorizing them to refuse to carry on their trains such passengers as may refuse to occupy the coaches or compartments to which he or she is assigned; to exonerate such railway companies from any and all blame or damages that might proceed from such refusal, to prescribe penalties for all violations of this act," etc.

The first section of the act requires that "all railway companies carrying passengers in their coaches in this State shall provide equal, but separate accommodations for the white and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations," and that "no person or persons shall be permitted to occupy seats in coaches other than the ones assigned to them on account of the race they belong to."

The second section provides, "That the officers of such passenger trains shall have power and are hereby required to assign each passenger to the coach or compartment used for the race to which such passenger belongs; any passenger insisting on going into a coach or compartment to which by race he does not belong shall be liable to a fine of $25, or in lieu thereof to imprisonment for a period of not more than twenty days in the parish prison;" and a like penalty is imposed on "any officer of any railroad insisting on assigning a passenger to a coach or compartment other than the one set aside for the race to which said passenger belongs;" and it is further provided that "should any passenger refuse to occupy the coach or compartment to which he or she is assigned by the officer of such railway, said officer shall have power to refuse to carry such passenger on his train, and for such refusal neither he nor the railway company shall be liable for damages in any of the courts of this State."

The 3d section provides penalties upon officers, directors and employees of railway companies who shall refuse or neglect to comply with the provisions of the act.

We have had occasion very recently to consider the constitutionality of this act as applicable to interstate passengers, and held that, if so applied, it would be unconstitutional because in violation

of the exclusive right vested in Congress to regulate commerce between the States. State ex rel. Abbott vs. Judge, 44 An. 583.

The instant case presents no such application of the statute; but it appears on the face of the information that relator was proceeded against as "a passenger traveling wholly within the limits of the State of Louisiana on a passenger train belonging to the East Louisiana Railroad Company carrying passengers in their coaches within the State of Louisiana." It thus appears that the interstate commerce clause of the Constitution of the United States is not involved.

The relator's plea of the unconstitutionality of the statute contains no less than fourteen enumerated paragraphs, which do not require reproduction, because most of them are argumentative, and no provisions of the State or federal Constitutions are referred to as violated by the statute except the thirteenth and fourteenth amendments to the Constitution of the United States. The whole gravamen of relator's plea is contained in the fourteenth ground, which is as follows: "That the statute in question establishes an insidious distinction and discrimination between citizens of the United States based on race which is obnoxious to the fundamental principles of national citizenship, perpetuates involuntary servitude as regard citizens of the colored race under the merest pretence of promoting the comforts of passengers on railway trains, and in further respects abridges the privileges and immunities of the citizens of the United States and the rights secured by the thirteenth and fourteenth amendments of the federal Constitution."

So far as the thirteenth amendment is concerned its application to this statute may be at once eliminated because the Supreme Court of the United States has clearly decided that it does refer to rights of the character here involved. We will, for the sake of brevity, quote only the syllabus of the decision, as follows:

"The XIIIth Amendment relates only to slavery and involuntary servitude (which it abolishes), and although by its reflex action it establishes universal freedom in the United States, and Congress may probably pass laws directly enforcing its provisions; yet such legislative power extends only to the subject of slavery and its incidents; and the denial of equal accommodations in inns, public conveyances and other places of public amusements, imposes no badge of slavery or involuntary servitude upon the party, but, at most, in-

fringes rights which are protected from State aggression by the XIVth Amendment." Civil Rights Cases, 109 U. S. 3.

We may, therefore, confine ourselves to the question, whether or not the statute violates the XIVth Amendment, which provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

A further elimination may be made of the question whether a statute requiring separate accommodations for the races without requiring the accommodations to be equal would contravene the amendment; because the statute here explicitly requires that the accommodations shall be equal.

We thus reach the sole question involved in this case, which is, whether a statute requiring railroads to furnish separate but equal accommodations for the two races, and requiring domestic passengers to confine themselves to the accommodations provided for the race to which they belong, violates the XIVth Amendment.

The first branch of the above question, as to the binding effect of the statute on railways, has been definitively decided by the Supreme Court of the United States, on a statute almost identical, holding that the provision requiring railroads to furnish separate but equal accommodations was valid. Louisville etc., Railway Co. vs. Mississippi, 133 U. S. 587.

But the court said: "Whether such accommodation shall be a matter of choice or compulsion [on the part of passengers] does not enter into this case."

The validity of such statutes, in so far as they require passengers, under penalties, to confine themselves to the separate and equal accommodations provided for the race to which they belong, has not, as yet, been directly presented to or decided by the Supreme Court of the United States. But the validity of such statutes and of similar regulations made by common carriers in absence of statute, and the validity of similar regulations or statutes as applied to public schools have arisen, in very many cases, before the highest courts of the several States and before inferior federal courts, resulting in an almost uniform course of decision to the effect that statutes or regulations enforcing the separation of the races in public

conveyances or in public schools, so long at least as the facilities or accommodations provided are substantially equal, do not abridge any privilege or immunity of citizens or otherwise contravene the XIVth Amendment.

We refer to the following amongst other numerous decisions: Westchester R. R. Co. vs. Miles, 55 Pa. Stat., 209; State vs. McCann, 21 Ohio, 210; People vs. Gallagher, 93 New York, 438; Cory vs. Carter, 48 Ind. 337; State vs. Duffy, 7 Nev. 342; People vs. Gaston, 13 Abb. N. Y. 160; Louisville, etc., Ry. vs. State, 66 Miss. 662; Lehew vs. Brummell (Mo.), 15 S. W. Rep. 765; Dawson vs. Lee, 83 Ky. 49; Ward vs. Flood, 48 Cal. 36; Chesapeake R. Co. vs. Wells, 85 Tenn. 613; Bertonneau vs. Directors, 3 Woods (C. C. R.) 177; The Suc. —, 22 Fed. Rep. 843; Logwood vs. Memphis, 23 Id. 318; Murphy vs. Western R. Co. 23 Id. 637.

It would little boot for us to make extensive quotations from these decisions. They all accord in the general principle that, in such matters, equality, and not identity or community, of accommodations is the extreme test of conformity to the requirements of the XIVth Amendment.

The cogency of the reasons on which this principle is founded, perhaps, accounts for the singular fact that notwithstanding the general prevalence throughout the country of such statutes and regulations, and the frequency of decisions maintaining them, no one has yet undertaken to submit the question to the final arbitrament of the Supreme Court of the United States.

In a case which arose as far back as 1849, the Supreme Court of Massachusetts, through its great Chief Justice, Shaw, considered this subject, saying: "Conceding, therefore, in the fullest manner, that colored persons, the descendants of Africans, are entitled by law to equal rights, constitutional and political, civil and social, the question then arises whether the regulation in question, which provides separate schools for colored children, is a violation of any of these rights." And the court held that it was not, saying, in conclusion: "It is urged that this maintenance of separate schools tends to deepen and perpetuate the odious distinction of caste founded in a deep-rooted prejudice in public opinion. This prejudice, if it exists, is not created by law and can not be changed by law. Whether this distinction and prejudice, existing in the opinions and feeling of the community, would not be as effectually fostered by compelling col-

ored and white children to associate together may well be doubted.''
Roberts vs. Boston, 5 Cush. 198.

The general rule applied to carriers is well stated by Mr. Hutch-
inson: '' If the conveyance employed be adapted to the carriage of
passengers separated into different classes, according to the fare
which may be charged, the character of the accommodations
afforded or of the persons to be carried, the carrier may so divide
them, and any regulation confining those of one class to one part of
the conveyance will not be regarded as unreasonable, if made in
good faith for the better accommodation and convenience of the pas-
sengers.'' Hutchinson on Carriers, Sec. 542.

In applying this rule, the Supreme Court of Pennsylvania said:
'' The right to separate passengers being clear in proper cases, and
it being the subject of sound regulation, the question remaining to
be considered is whether there is such a difference between the
white and black races of this State, resulting from nature, law and
custom, as makes it a reasonable ground of separation.'' The court
then proceeds to discuss these differences, taking care to say: '' To
assert separateness is not to declare inferiority in either. It is sim-
ply to say that following the order of Divine Providence, human
authority ought not to compel these widely separated races to inter-
mix.'' Concluding, the court said: '' Law and custom having
sanctioned a separation of races, it is not the province of the judi-
ciary to legislate it away. * * Following these guides, we are com-
pelled to declare that, at the time of the alleged injury, there was
that natural, legal and customary difference between the white and
black races in this State which made their separation as passengers
in a public conveyance the subject of a sound regulation to secure
order, promote comfort, preserve the peace and maintain the rights
both of carriers and passengers.'' Westchester R. R. Co. vs. Miles,
55 Pa. St. 209.

Both the decisions, from which we have quoted, were rendered
before the adoption of the XIVth Amendment, but in States where the
civil rights of the colored race were fully recognized. We have
referred to them as indicating the germinal principles which have
been followed in the numerous decisions cited above applying the
XIVth Amendment. That amendment, it is well settled, created no
new rights whatever, but only extended the operation of existing
rights and furnished additional protection for such rights. Barbier

vs. Connelly, 113 U. S. 27; U. S. vs. Cruikshanks, 92 U. S. 542; Slaughterhouse Cases, 16 Wall. 36.

The statute here in question is an exercise of the police power and expresses the conviction of the legislative department of the State that the separation of the races in public conveyances, with proper sanctions enforcing the substantial equality of the accommodations supplied to each, is in the interest of public order, peace and comfort. It undoubtedly imposes a severe burden upon railways; but the Supreme Court of the United States has held that they are bound to bear it. It impairs no right of passengers of either race, who are secured that equality of accommodation which satisfies every reasonable claim.

The regulation of domestic commerce is as exclusively a State function as the regulation of interstate commerce is a federal function. It is as much within the control of State legislation as the public school system or the law of marriage. To hold that the requirement of separate, though equal, accommodations in public conveyances violated the XIVth Amendment would, on the same principles, necessarily entail the nullity of statutes establishing separate schools, and of others existing in many States, prohibiting intermarriage between the races. All are regulations based upon difference of race, and if such difference can not furnish a basis for such legislation in one of these cases it can not in any.

The statute applies to the two races with such perfect fairness and equality that the record brought up for our inspection does not disclose whether the person prosecuted is a white or a colored man. The charge is simply that he " did then and there unlawfully insist on going into a coach to which by race he did not belong." Obviously, if the fact charged be proved, the penalty would be the same whether the accused were white or colored.

We have been at pains to expound this statute, because the dissatisfaction felt with it by a portion of the people seems to us so unreasonable that we can account for it only on the ground of some misconception. Even were it true that the statute is prompted by prejudice on the part of one race to be thrown in such contact with the other, one would suppose that to be a sufficient reason why the pride and self-respect of the other race should equally prompt it to avoid such contact, if it could be done without the sacrifice of equal accommodations. It is very certain that such unreasonable insistence

upon thrusting the company of one race upon the other, with no adequate motive, is calculated, as suggested by Chief Justice Shaw, to foster and intensify repulsion between them rather than to extinguish it.

We will conclude by noticing some charges made against the statute by relator, based, as we think, on an utterly unwarranted construction.    He claims that the statute vests the officers of the company with a judicial power to determine the race to which the passenger belongs; that they may assign the passenger to a coach to which by race he does not belong, and that such an assignment is binding on the passenger, and that, though wrongfully made, the officers and railway companies are exempted from any legal responsibility.

The reading of the statute utterly repels these charges.

Not only does not the statute authorize the conductor or other officer to assign a passenger to a coach to which by race he does not belong, but it affirmatively requires him " to assign each passenger to the coach used for the race to which such passenger belongs," and it punishes him for failure to make such assignment.    When the statute authorizes the conductor to refuse to carry any passenger who shall "refuse to occupy the coach to which he or she is assigned by the officer of such railway," it obviously means an assignment according to the requirements of the act—i. e., to the coach to which the passenger by race belongs; and the exemption from damages is subject to the same construction.    It is too clear for discussion that a refusal to carry a passenger because he had refused to obey an assignment to a coach to which his race did not belong would not be exempted from redress in action for damages.

The discretion vested in the officer to decide primarily the coach to which each passenger by race belongs is only that necessary discretion attending every imposition of a duty, to determine whether the occasion exists which calls for its exercise.    It is a discretion to be exercised at his peril and at the peril of his employer.

It is very certain that if relator shall prove in this prosecution that he did not, as charged, " insist on going into a coach to which he did not belong," an erroneous assignment by the conductor would not stand in the way of his acquittal, or exempt the officer and the railway from action for damages, whatever defences might be open to them based on good faith and probable cause.

It is therefore ordered that the provisional writ of prohibition herein issued be now dissolved and set aside, and that the relief sought be denied at relator's cost.

Rehearing refused.