98 Ky. 539, 33 S. W. 948, 17 Ky. Law Rep. 1091, 32 L. R. A. 108, is pertinent.

The process by attachment had been issued. A reasonable delay might have been given to ascertain positively whether the witness could or not appear in court within a reasonable time.

Our view upon this point dispenses us from the necessity of passing upon the other grounds of attack of the defense save those (hereinafter set forth in the course of the trial) directed against the validity of the indictment.

The accused urge that the dangerous weapon, to wit, a stick, alleged in the indictment, is in no manner set out.

We agree with our learned brother of the district court that the word "stick" is a synonym for a "club."

We will go one step further, and state that it is sometimes as dangerous as any other weapon.

A well-directed blow with a stick is more dangerous than a pistol held by a trembling hand.

Moreover, the defense did not file a motion to quash, but went to trial, and on the trial proof was admitted to prove that it was not a small harmless cane.

One of the accused, Drozin Barnes, has abandoned his appeal. We have no wish of denying him the privilege of serving out his sentence.

We had passed upon the first ground when we determined to remand the case; for that reason, it remains as written in the first part of the opinion.

For reasons stated, it is ordered, adjudged, and decreed that the judgment of the district court be avoided, annulled, and reversed only in so far as relates to Albert Richard; the case be remanded as to him for a new trial in accordance with the views herein expressed as relates to Albert Richard. As relates to Drozin Barnes, having abandoned his appeal, it is not necessary that further action be taken; his case is not before the court.

---

(53 South. 671.)

No. 18,070.

## MAY v. SHREVEPORT TRACTION CO.

(Nov. 28, 1910.)

*(Syllabus by the Court.)*

1. STREET RAILROADS (§ 70*)—CARRIAGE OF PASSENGERS—ASSIGNMENT OF WHITE AND COLORED RACES TO SEPARATE COMPARTMENT.

The discretion vested in street railway companies and their officers and agents by Act No. 64 of 1902, with regard to the assignment of the white and colored races, respectively, to separate compartments in street cars, is to be exercised by them at their own peril, and they, and not the sufferers, are liable for the consequences of their mistakes or their abuse of such discretion.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

2. CARRIERS (§ 280*)—CARRIAGE OF PASSENGERS—DUTY TO PROTECT PASSENGERS.

A carrier of passengers is as much bound to protect them from humiliation and insult as from physical injury.

[Ed. Note.—For other cases. see Carriers, Cent. Dig. §§ 1085–1117; Dec. Dig. § 280.*]

3. CARRIERS (§ 283*)—CARRIAGE OF PASSENGERS—INSULT OF PASSENGER BY CONDUCTOR—RIGHT OF RECOVERY.

To apply the term "negro" to a white person is humiliating and insulting, and a suggestive question. such as, "Don't you belong over there?" addressed to a white person, by the conductor of a street car, who points to the seats reserved for negroes, is but little less so. In either case, and whether the language used be heard by others or not, an action in damages will lie against the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1121; Dec. Dig. § 283.*]

Appeal from First Judicial District Court, Parish of Caddo; A. J. Murff, Judge.

Action by Mrs. Emma May against the Shreveport Traction Company. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

John B. Files and Hugh C. Fisher, for appellant. Wise, Randolph & Rendall, for appellee.

## Statement of the Case.

MONROE, J. Plaintiff sues for damages, on the ground, as stated in her petition, that she boarded one of defendant's cars, in which there were a number of passengers, and, having taken her seat in the compartment assigned to white passengers, and paid her fare, she was asked by the conductor, "Don't you belong over there?" pointing to the seats reserved for negro passengers, and designated by a large sign, marked "Colored"; that petitioner, with great surprise, asked him what he meant, and the conductor repeated, in a loud and rough tone of voice, "You are in the wrong seat; you belong over there," again pointing to the seats set aside for negro passengers. She alleges that the attention of the passengers was attracted; that they stared at her with suspicion and contempt; and that she felt much humiliated and embarrassed. She further alleges that she caused the conductor to be arrested; that he was fined; that defendant's manager, and trainmaster, and the same conductor, thereafter, further abused her by declaring, publicly, that she frequently rode in the colored compartment of the car, and have libeled her by causing to be published, in a newspaper, the statement:

"Mrs. May boarded McCoy's car, on Thursday afternoon (Dec. 24, 1908) and took her seat behind the 'colored' sign."

And by publishing in another paper the statement:

"Mrs. May, once before, rode in the negro department."

She alleges that she is of the Caucasian race, and that the matter complained of has injured her in various ways, which she sets out in detail. None of the passengers to whom plaintiff refers in her petition appeared as witnesses in the case, save a lady, who testified that she was seated near the front of the car, whilst plaintiff was near the rear end, and that, though she heard plaintiff "jawing" a good deal at the conductor, she did not hear what he said. Plaintiff's version of the matter, as given in her testimony, differs from that given in her petition, in that she says that the conductor, having received her fare, said:

"'You belong over there.' And I was greatly surprised, and I asked him what he said. I am hard of hearing. And he goes on up the car and receives two more fares, and, as he came back, I says: 'Young man, what did you say? What do you mean?' And there was a gentleman sitting over on the seat opposite me, and I looked over at that man, and I says: 'That man is drunk or crazy—must be crazy.' This frustrated me, so I got off the car and went and had him arrested—went to Judge Fullilove's office."

At another time she tells the story as follows:

"When he came around to me and got my fare, he received the fare, and says, 'You belong over there.' I could not hear very good, and I says, 'What did you say?' He did not answer me, but went on and received two more fares, and, when he came back, I approached him again, and I says: 'What do you mean?' He says: 'You are in the wrong seat. You belong over there. You are a negro woman.' Pointing to the negro seats, seats reserved for negroes, he says: 'You are a negro woman.'"

Our conclusion, after considering the statements above given, the allegations of the petition, which were predicated upon information obtained from plaintiff, the testimony of Messrs. Wise and Freyer (of the law firm by which defendant was represented before Judge Fullilove), the testimony of the judge, himself, as to the "trend" of the conductor's testimony on the occasion of his trial in the city court, and the testimony of the conductor, as given in this case, is that what took place was about as follows: Plaintiff, having taken her seat in that part of the car assigned to white passengers, and having paid her fare, was asked by the conductor, "Don't you belong over there?" He at the same time pointing to the seats, behind the sign "Colored," intended for the use of negroes. Plaintiff being a little deaf, and surprised at the question, as she understood it, said to him, "What did you say? what do you

mean?" The conductor however, moved on, towards the front of the car, and collected some other fares, and, on his return, plaintiff repeated her question, and he repeated his, probably in a somewhat louder voice, again pointing to the seats reserved for negroes. Plaintiff had, by that time, become considerably excited, and the conductor was disposed to drop the subject, and did so, so far as he was allowed, but plaintiff continued talking at, or to, him, until, within a few minutes, she got off the car, and, as she states, went to the city court and preferred a charge upon which the conductor was arrested, and at a hearing, some days later, was fined $5. When notified of the charge against him, the conductor went to the police station and surrendered. Whereupon defendant's manager signed a bond for his appearance, and, on that occasion, we think, he told the manager, in the presence of others, that he had seen, or thought he had seen, plaintiff, on a previous occasion, riding in the negro end of the car, but, being asked whether he could prove it, said that he could not. It seems probable that the statement, to the effect that she had so ridden, as published in the papers, originated in that way. No attempt was made on the trial of this case to substantiate the statement, save that the conductor testified that he had seen either the plaintiff or some one who looked like her riding in the negro end of the car. We find no reason to doubt that there were passengers in the car who heard the conductor ask the question here complained of, and who understood the significance of his gestures, in pointing to the seats behind the sign; the fact that the lady who testified on behalf of the company did not hear, or see, him, being natural enough, as she was seated at the other end of the car (which was in motion and making considerable noise) with her face in the other direction. Why no other witnesses were produced we

are, of course, unable to say, except that it appears that plaintiff is a very poor woman and did not have the facilities for looking up witnesses and inducing them to come into court that are possessed by others differently situated. We do not find that plaintiff has been injured, in the estimation of her friends and acquaintances, by the incident here in question; but there is no doubt that she was very much mortified, at the time, and has been very much distressed and disturbed since. The question, then, is: Do the questions and acts of the conductor, all the circumstances considered, furnish her a sufficient cause of action for damages against defendant? That question was first submitted to a jury, who disagreed over it. It was then submitted to the judge of another division of the district court, who arrived at the facts, as we have done, by reading the typewritten testimony, and answered the question in the negative.

### Opinion.

The learned judge a quo has summed up the facts in an able written opinion, and there is but little difference between us on that subject. His view, however, was: That, the conductor was required by law to assign white people to one part of the car and colored people to another; that it was necessary for him, in some way, to obtain the information required for the discharge of that function; and that the method adopted was the least objectionable—the conclusion being that the incidental hurt, sustained by plaintiff should be regarded as damnum absque injuria. We are unable to concur in that conclusion. It is true that, where the law imposes a duty upon an individual or an officer, the courts are usually disposed to be lenient with regard to mistakes committed in the honest effort to discharge such duty; but the rule, which obtains wherever justice is recognized and administered, nevertheless, is that he who makes the mistake,

and not the victim, shall, so far as practicable, be made to suffer the consequences. It is thus written in our law:

"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it." Civ. Code, art. 2315.

The particular statute relied on by defendant as imposing a duty upon it, and as thereby exempting it from liability for injury to others whilst attempting, in good faith, to discharge that duty, is Act No. 64 of 1902, which requires that all street railway companies shall provide separate accommodations on their cars for the white and colored races, and that:

"No person or persons shall be permitted to occupy seats in cars, or compartments, other than the ones assigned to them on account of the race they belong to."

The act imposes a penalty upon the passenger who insists on going into a compartment, to which, by race, he does not belong, and a penalty upon the officer of the railway company who insists upon assigning the passenger to such compartment, and it empowers and requires the officers of "such street cars to assign each passenger to the car or compartment used for the race to which such passenger belongs." The officer, therefore, who insists upon assigning the passenger to the wrong compartment, violates the law, and thereby subjects himself to its penalty, of a fine or imprisonment, as, also, to an action in damages, by the passenger. Upon the other hand, if he does not insist, in a proper case, he subjects himself to the penalty imposed by the act, and it is argued that, in order to protect himself from such penalty, he may, by his inquiries upon the subject, suggest that any white passenger in the car is a negro, or looks like a negro, or consorts with negroes, and intimate that he belongs in the negro compartment. In other words, no matter what may be the humiliation or injury inflicted upon the passenger, the carrier, to which he has intrusted himself, and from which, under his contract and under the law, he is entitled to protection from injury to his person and feelings, is to be saved harmless from the penalties imposed by the act of 1902, and all responsibility as to the manner in which the discretion vested by that act in the carrier is exercised, so long as the carrier acts in good faith, without express malice, is to be shifted from its (the carrier's) shoulders to those of the passenger.

The position is wholly untenable, on general principles, and has been, in effect, specifically repudiated by this court. Thus, under Act No. 111 of 1890, providing for separate accommodations for the white and colored races, on interstate traffic railroads, one Plessy, a passenger, was prosecuted and convicted for a violation of the act in insisting "on going into a coach, to which, by race, he did not belong," and he brought his case up, by habeas corpus, on the question of the constitutionality of the statute. In an exhaustive opinion, in which the statute was maintained, Mr. Justice Fenner, as the organ of this court, among other things, said:

"It (the statute) undoubtedly imposes a severe burden upon railways; but the Supreme Court of the United States has held that they are bound to bear it. It impairs no right of passengers of either race, who are secured that equality of accommodation which satisfies every reasonable claim. * * * The discretion vested in the officer to decide, primarily, the coach to which each passenger, by race, belongs, is only that necessary discretion attending every imposition of a duty, to determine whether the occasion exists which calls for its exercise. It *is a discretion to be exercised at his peril and at the peril of his employer*." (Italics by the present writer.) Ex parte Plessy, 45 La. Ann. 87, 88, 11 South. 948, 951, 18 L. R. A. 639.

A similar view has, since, been expressed by Mr. Justice Russell of the Court of Appeals of Georgia, in the main opinion, in Wolfe v. Georgia Ry. & Electric Co., 2 Ga. App. 499, 58 S. E. 899 (decided in 1907), though, upon that particular point, the two concurring justices disagreed with the organ of the court. Mr. Justice Russell said:

"In no case where a passenger is mistreated can the fact that the servant of the company was carrying out the provisions of the Penal Code be used as a defense, unless it appears that such servant was acting outside the scope of his employment. The conductor acts at the peril of his employer. The police power, the duty of executing the law requiring the separating of the races, is not placed upon the conductor as an individual, but upon a particular agent of the company, to enable the carrier to better perform its duty of protecting its passengers—of protecting them, not only from assault and physical injuries, but, also, from abuse and insult."

The case thus cited was one in which it appeared that the plaintiff, a white person, was directed by the conductor of a street car, in Atlanta, to occupy a seat among those which were assigned to the colored race, and in which it was held that the fact stated furnished a cause of action for damages against the company operating the car.

We have, then, the law, already quoted, which obliges him through whose fault damage is sustained to repair the damage; the established doctrine that he upon whom is imposed the duty of executing a law discharges that duty at his own peril; and the universally recognized rule (in support of which we need cite no authority) that a carrier of passengers is as much bound to protect them from humiliation and insult as from physical injuries; and, applying law, doctrine, and rule to this case, we find: That plaintiff, a white woman, was a passenger on a car operated by defendant, and that defendant, through its agent, the conductor, in the discharge of the duty, imposed on it by the act of 1902, to assign passengers of the white and colored races, respectively, to different compartments, intimated to the plaintiff that in his opinion she was a negro, and that her proper place in the car was in the compartment assigned to the negro race. We now apply to the case another doctrine, which is also well established, to wit, that, to charge a white person, in this part of the world, with being a negro, is an insult, which

must, of necessity, humiliate, and may materially injure, the person to whom the charge is applied. This court has said:

"Under the social habits, customs, and prejudices prevailing in Louisiana, it cannot be disputed that charging a white man with being a negro is calculated to inflict injury and damage. * * * This was treated as an actionable slander by the court organized under the Constitution of 1868. Toye v. McMahon, 21 La. Ann. 308." Sportorno v. Fourichon, 40 La. Ann. 424, 4 South. 71.

In a later case, a daily newspaper published a dispatch in which the plaintiff was referred to as a negro; the mistake having been made by the telegraph operator who converted the word "cultured" into "colored." An apology was published, immediately (and it may here be stated that defendant's conductor and attorney called upon the plaintiff, in the instant case, the day following the incident out of which this suit has arisen, and that the conductor tendered an apology), and it was found by this court that there was no actual malice. Mr. Justice (now Chief Justice) Breaux, as the organ of the court, however, said:

"The word complained of was provoking to an extreme degree. Inserted as it was, in one of the daily papers, it was enough to arouse the most profound indignation of the most patient man. * * * But retraction and apology, even when timely, are not all that is needful to relieve a publishing company from liability; for injury, resulting from oversight or negligence, may give rise to liability in damages. A newspaper would yet be liable, if an injurious truth found its way into columns through the merest accident. The law seeks to protect the innocent who has been injured by libelous reports. The fact that a management can be all that can be expected to guard against unfortunate accidents is not, in itself, a protection from damages and a sufficient defense." Upton v. Times Democrat Publishing Co., 104 La. 143, 28 South. 971.

In the case of Flood v. News & Courier Co., 71 S. C. 112, 50 S. E. 637, the Supreme Court of South Carolina, after a careful consideration of the subject (referring to the thirteenth, fourteenth, and fifteenth amendments), said:

"We therefore hold that these three amendments to the federal Constitution have not

destroyed the law of this state, which makes the publication of a white man as a negro anything but libel."

It is true that, in the instant case, we do not find it sufficiently proved that the conductor, in direct terms, applied the word "negro" to the plaintiff; but we consider that immaterial. The question, "Don't you belong over there?" when the person asking it points to seats in a car set apart for negroes and designated by a sign, is sufficient to wound the feelings of the white person to whom it is addressed, and, for that wound, the defendant is bound to render an account. We are of opinion that there were passengers who heard the question, and, undoubtedly, the cause of the trouble was known to them all, or to the most of them, before plaintiff left the car. Defendant's counsel seems to think that no one would have known of the matter if plaintiff had not been somewhat deaf, and if she had remained silent, and that defendant is not responsible for either her deafness or her loquacity. The injury to plaintiff's feelings would have been inflicted, however, if no one but she had heard the suggestive question, and the fact that the conductor was compelled to raise his voice in order to make her hear a question which it was an insult to her for him to ask, and that she was unable to restrain her indignation, can hardly excuse the defendant.

Being of the opinion that plaintiff was not injured in the estimation of her friends and acquaintances or of the public at large, and that the only malice which can be attributed to the defendant is such as the law imputes, from a wrongful act, done without just cause or excuse, the only remaining question is as to the quantum of damages, and that we fix at $250.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, Mrs. Emma May, wife of L. G. May, and against the defendant, the Shreveport Traction Company, in the sum of $250, with legal interest thereon from the date at which this judgment shall become final until paid, and all costs.