William J. KIHNEMAN, Plaintiff,

v.

**HUMBLE OIL & REFINING COMPANY, Defendant.**

Civ. A. No. 67–595.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 31, 1970.

———◆———

Russell J. Schonekas, New Orleans, La., for plaintiff.

William J. Kihneman, in pro. per.

H. H. Hillyer, Jr., R. King Milling, New Orleans, La., for defendant.

RUBIN, District Judge:

## I. FINDINGS OF FACT

This suit, like a pride of others, was born when Humble Oil and Refining Company (Humble) sued Jack F. Harang (Harang), a Louisiana geologist, and named a number of other persons co-defendants. William J. Kihneman (Kihneman), one of the defendants, here seeks to recover damages for invasion of privacy, malicious prosecution, and defamation, all arising out of the filing of that suit.

Humble's complaint, filed in 1966,[1] claimed that Harang had entered into a secret arrangement with one of Humble's then trusted geologists by which the two had improperly profited from transactions with Humble. Humble contended that, in one instance (the Avondale Field), the proof of the arrangement was in writing and that Harang acted on his own behalf. Humble claimed that, in other instances, Harang acted through brokers, and the proof of the agency was not a matter of public record. The leases acquired by Harang on his own behalf were held in Harang's name whereas the leases and overriding royalties acquired through agents were held in the names of the individual agents, one of whom was Kihneman.

---

1. Because of extensive discovery, and a number of other problems, including a change of counsel for the defendant, this suit has not reached trial.

Humble now contends also that, when Civil Action 66–697 was filed, Humble did not know whether or not these agents had executed counter letters or unrecorded assignments in favor of Harang.

The affidavits and depositions filed in connection with Humble's motion for summary judgment establish beyond genuine dispute that, before the pleadings in Civil Action 66–697 were drawn, Humble consulted counsel to determine whether it had a cause of action against Harang; and that the lawyers consulted advised that grounds for action appeared to exist, based on several legal theories. Humble decided to file suit and to allege the different legal theories in separate counts of a single complaint. This was done.

The First Count alleged various facts that may or may not be established at the trial against Harang. It sought recovery in tort from Harang and a corporation that he allegedly controlled, Geological, Geophysical Associates, Inc. (GGA), for tortious interference with the employment relationship between Humble and its former employee. The Second Count sought an accounting from Harang and GGA of all secret profits derived by them from the alleged tortious use of Humble's confidential information, in addition to the damages demanded in the First Count. The Third Count was an alternative one; it sought equitable relief on theories of breach of trust and unjust enrichment so as to require, first, an accounting for all secret profits derived from the transactions affecting certain described mineral leases, and, second, specific relief respecting certain overriding royalty interests, either in the form of the impression of a trust or a decree of ownership. The Fourth Count sought injunctive relief to maintain the status quo respecting documents in the hands of the defendants. Kihneman, like the other agents through whom Harang is alleged to have acted, was named as a co-defendant. Kihneman claims no damage from Counts One and Two, which did not name him, but does claim that he was defamed, his privacy was violated, and he was maliciously prosecuted by the filing of the Third and Fourth Counts and the affidavit attached to the complaint.

The allegations made with respect to Kihneman were:

(1) "Also made parties defendant * * * are certain persons who are not charged with knowing participation in any fraudulent activity herein alleged, viz: * * * William J. Kihneman * * *."

(2) "In the Potash Field, Plaquemines Parish, La., using [Humble's] secret information * * * Harang caused a lease broker * * * to acquire for Harang's or GGA's account a lease on the A. Treadway tract and a lease on the A. T. Ballay, et al. tract. * * * Harang [then] caused [the broker] to assign a ⅟₄₈th override on the Treadway tract to [a second broker], who is a person interposed for Harang or GGA and holds for Harang's or GGA's undisclosed account, and that Harang then caused [the first broker] to transfer said leases to Harang's attorney, Kihneman, and thereafter caused said attorney, for Harang's or GGA's undisclosed account, to offer them to [Humble] for a total price of $5,250.00. When Harang caused Kihneman to offer said leases to [Humble], Harang concealed from [Humble] that the leases had been acquired as a result of the ex-employee's betrayal of trust and that the ex-employee or Tammany [a corporation allegedly controlled by the ex-employee] was interested therein. [Humble], not knowing of the betrayal of trust and that its confidential information was being used against it, accepted the transfer and paid the price. * * *"

(3) "[Humble] does not charge Messrs. * *‚ * [and] Kihneman with knowledge of or knowing participation in the fraudulent conspiracy above alleged, but believes that they were merely persons interposed for Harang or GGA and the unwitting tools of Harang's machinations. However, by reason of‚ their holding title for Harang's or GGA's account, as aforesaid, they are made defendants herein."

(4) "[Humble] prays that there be judgment in its favor * * * [a]gainst * * * Kihneman * * * impressing a trust in their ₁respective hands of the overriding royalty interests acquired by the use of [Humble's] confidential information as aforesaid, or alternatively, decreeing said overriding royalty interests to inure to [Humble's] benefit."

(5) "It lies within the power of * * * Kihneman * * * to destroy or otherwise dispose of or conceal documents, records, ‚checks, maps and other writings relating to the transactions described * * * before [Humble] can obtain sufficient discovery to specify the documents in question and require the production thereof."

(6) "[Humble] believes, and hence avers, that Harang, and the other persons above named at his command or urging, will conceal, destroy, or otherwise dispose of or attempt to place beyond the reach of the Court documents, records, checks, maps and writing (sic) relating to the transactions above alleged unless enjoined from so doing by this Court, pending final determination of this action. * * *"

(7) "[Humble] demands judgment enjoining the defendants and each of them from concealing, destroying, or otherwise disposing of or attempting to place beyond the reach of the Court, any document, record, check, map or writing relating to the transactions described in * * * this Complaint * * *."

The prayer of the Third Count sought an accounting of the profits derived by Harang and GGA from the sale of mineral leases affecting Louisiana immovable property, and claimed ownership of the overriding royalties affecting them from Harang. Whether or not Harang or GGA is ultimately shown to have derived such profits, it is undisputed in this action that, except for Avondale, Harang's beneficial ownership of either leases or overrides was not a matter of public record, and that Humble did not know whether unrecorded counter letters or assignments in his favor were in existence. The public records reflected that the leases in question had been taken by a lease broker and (except for Avondale and Good Hope) transferred by that lease broker to another lease broker who in turn transferred them to Humble.

Humble contends that it will be necessary to establish Harang's beneficial ownership of the overriding royalties in order to obtain an accounting, and that the parol evidence rule will apply to bar proof of these facts by testimony alone in the Harang suit. In support of this contention Humble cites various Louisiana cases, including Hayes v. Muller, 1963, 245 La. 356, 158 So.2d 191.

In *Hayes*, Knox, Muller, and Hayes entered into a verbal joint adventure agreement to invest in certain mineral interests. The parties had previously entered into similar joint adventures through which mineral leases and royalties were obtained in the name of one of the parties, each party was later assigned his proportionate share, and the proceeds and properties resulting from the different transactions were ultimately equally divided. Muller obtained, in his own name, an oil and gas lease in the area agreed upon in the joint venture contract. Before assigning the oth-

er parties their respective interests, Muller sold the lease and refused to pay Knox and Hayes their interests in the proceeds. Hayes and Knox sought judicial enforcement of the agreement and, alternatively, an accounting of the profits derived from the sale of the lease. On rehearing, the Supreme Court stated that parol evidence would not be admissible to show the terms of the verbal agreement. "The parol evidence rule has been applied by this court not only in cases involving contracts which directly affect title to realty but also in others where the litigants merely sought to derive benefits growing out of verbal agreements relating to the sales of immovable property." 158 So.2d at 198.

There are however Louisiana cases indicating that this doctrine is limited to actions between the parties and that the parol evidence rule would not apply to prevent Humble from proving Harang's ownership of the mineral leases involved. See Fontenot v. Fontenot, La.App.1965, 175 So.2d 910, 912, and the cases cited therein. But that question need not be decided now. For, whether or not Humble's counsel were correct in their appraisal of the Louisiana rule, it is undisputed that they reached a good faith conclusion that Kihneman should be sued, based on their interpretation of Hayes v. Muller and other Louisiana decisions, and advised their client to act on this interpretation of the law. They were of the opinion that, if Humble were to recover either profits or overrides from Harang, the lease brokers would have to be made parties to avoid summary dismissal of its suit.

Hence, in the Alternative Third Count, Humble joined as parties each of the persons who, it claimed, held the leases for Harang. Where an overriding royalty was asserted, Humble joined each person holding record title to the override (except one person who had died after the transaction).

## II. CONCLUSIONS OF LAW

### A. GENERAL

■ Whether or not it was necessary for Humble to make Kihneman a party to its suit against Harang, Kihneman was joined on counsel's advice, reached in good faith, on an interpretation of Louisiana law that was at least tenable. It is a fundament of the American system of justice that the courts remain open to claims asserted in good faith; indeed, every legal system seeks to substitute a method of orderly adjudication of rights for self help and violence. Litigants are encouraged to seek the courts to remedy their supposed wrongs, and the unsuccessful suitor is not to be held in damages merely because he was mistaken in his belief that he had a proper case. Even when a claim is unsuccessful, counsel's fees cannot, in the usual case, be recovered. For it is considered that burdening the unsuccessful plaintiff with such expense would tend to restrict access to the courts to affluent suitors.[2] For the same reason, the litigant who is unable even to pay court costs is afforded access to the forum by the suit in forma pauperis without regard to the likelihood of his prevailing in the suit.

■■ But some protection is afforded a defendant against improper use of the courts. The processes of justice may not be perverted by a litigant who does not use them in a good faith effort to vindicate his rights but only to pur-

---

2. "The very nature of judicial proceedings presupposes that suitors will be put to some trouble in defending and prosecuting suits, but as a general rule, these damages are, in the eye of the law, supposed to be covered by the taxed costs. It is desirable that courts of justice should be open to all men, and that suitors should not be deterred from pursuing their rights through fear that they should be compelled to pay for the loss of time of their adversary, not from using, in good faith, the process of the court and the means of redress prescribed by law, through apprehensions that they should be mulct in vindictive damages, if from any unforeseen cause, they should fail in their action." Osborn v. Moore, 1857, 12 La.Ann. 714.

sue a vendetta. If a defendant is defamed either in the pleadings or by utterances in the course of the action, he may have an action for defamation. If he can show that the prosecution was instituted without probable cause, he may have an action for malicious prosecution. But here again the policy that good faith litigation should not be discouraged protects even defamatory publications with a qualified privilege. This same policy permits the action for malicious prosecution only when, as the name of the action implies, the prosecution originated in motives that the law deems malignant.

## B. AS A MATTER OF LAW, THERE WAS NO INVASION OF PLAINTIFF'S PRIVACY

■ Plaintiff's claim for invasion of privacy is confined to the filing of Civil Action 66–697. The filing of a lawsuit may give rise to an action for malicious prosecution or to an action for defamation, but not to an action for invasion of privacy. Kenner v. Cousin, 1927, 163 La. 624, 112 So. 508; Young v. Courtney, 1858, 13 La.Ann. 193, 195–196; Osborn v. Moore, 1857, 12 La.Ann. 714; Cade v. Yocum & Jones, 1853, 8 La.Ann. 477, 478. Louisiana has never recognized that an invasion of privacy could occur merely by the filing of a lawsuit. Neither counsel nor the court have been able to locate a reported opinion that supports a different view. See generally, Comment, 1968, 28 La.L.Rev. 469 for a survey of the areas in which the Louisiana courts have recognized the right of privacy. This rule is grounded in Louisiana's public policy, and does not stem simply from "blind obedience to the past."[3]

## C. HUMBLE DID NOT PROSECUTE PLAINTIFF MALICIOUSLY

■ At common law, the privilege with respect to allegations in judicial pleadings is absolute: an utterance, however vile or baseless, is protected regardless of the motive that actuates the person who publishes it. Restatement of Torts, § 587. Hence at common law, the sole remedy with respect to improper use of the courts is malicious prosecution. This action may now be brought in most jurisdictions whether the original prosecution was civil or criminal. Restatement of Torts, §§ 653–673 (criminal), 674–680 (civil). See, e.g., Kogos v. Rittiner, La.App.1969, 228 So.2d 62, 69.

■ Louisiana recognizes a civil action for malicious prosecution, but only when "a clear case * * * [is] established as where justice has been perverted for the gratification of private malice." Blanchard v. Employers Liability Assurance Corp., La.App.1967, 197 So.2d 386, 389. Malicious prosecution is not established until it is shown both that the prior litigation ended in victory for the present plaintiff[4] and that it was commenced without probable cause and with malice. Eusant v. Unity Industrial

---

3. Holmes, The Path of the Law, 10 Harv. L.Rev. 457, 469 (1897).

4. After Humble had pursued discovery in the Harang suit and Kihneman and Harang had admitted under oath in writing that Kihneman was acting for Harang and had held title to the leases for Harang's account, Humble felt that Kihneman's presence was no longer necessary to prove title to the leases and voluntarily dismissed its suit as to him with prejudice. Kihneman did not oppose the dismissal.

In the ordinary defamation suit the plaintiff need not show that the proceeding terminated in his favor. Professor Wex Malone has suggested that, because statements made in the course of a judicial proceeding are protected by a qualified privilege rather than an absolute privilege and may therefore be actionable as defamation, the distinction between the torts of defamation and malicious prosecution is virtually non-existent in Louisiana. Because of the consolidation of these alternative theories a plaintiff, by proceeding solely on the defamation theory, may pursue recovery for alleged defamation in judicial pleadings without first having to show termination of the proceeding in his favor. See Malone, The Work of the Supreme Court, 15 La. L.Rev. 314 (1955).

Life Insurance, 1940, 195 La. 347, 196 So. 554 and cases cited therein, 196 So. at 556.

■ For the purpose of this suit, we need not search the recesses of the Louisiana jurisprudence to determine the full purport of the term "malice." In this area, as it is defined in the Louisiana cases, there is a litmus sufficient to detect its nonexistence: where a litigant has made full disclosure to his attorney and has acted on his attorney's advice honestly and in good faith, the action for malicious prosecution will not lie. As the Louisiana Supreme Court said in Brooks v. Bank of Acadia, 1916, 138 La. 657, 70 So. 573, 575: "Advice of counsel, even though erroneous, on questions of law, when accepted and acted on by the client in good faith, is a shield against charges of malice and bad faith." See also, Sandoz v. Veazie, 1901, 106 La. 202, 30 So. 767; Eusant v. Unity Industrial Life Insurance, 1940, 195 La. 347, 196 So. 554 and cases cited therein, 196 So. at 556. *Cf.*, Matassa v. Bel, 1964, 246 La. 294, 164 So.2d 332, reversing the Fourth Circuit Court of Appeal, 156 So.2d 250.

Here there is no showing that the defendants used the occasion for suing Harang to join Kihneman for any purpose other than to protect Humble's legal interests. Humble acted on the advice of counsel; it had probable cause to sue Kihneman.

Even if Humble's counsel were mistaken in their legal analysis and it was unnecessary to sue Kihneman, that does not make his joinder actionable. It is uncontroverted that Humble communicated to its counsel all facts known to it, that Humble's counsel advised Humble of the necessity of joining Kihneman, and that Humble acted upon the advice received, honestly and in good faith. Thus, there is no genuine issue as to any material fact and Humble is entitled to a summary judgment as a matter of law because, under Louisiana law, reasonable advice of counsel reasonably relied upon is a complete defense to a claim of want

of probable cause. Eusant v. Unity Industrial Life Insurance, 1940, 195 La. 347, 196 So. 554, 556; Brooks v. Bank of Acadia, *supra*; Sandoz v. Veazie, *supra*; Blanchard v. Employers Liability Assurance Corp., La.App.1967, 197 So.2d 386. As a matter of law, malice was absent from the prosecution, lack of probable cause being of the essence of the tort.

There is no suggestion of any evidence whatever that Humble or any of its counsel bore any ill will toward the plaintiff. In this respect Kihneman says only that malice "must" have existed because there was no other reason to sue him. But he suggests not a scintilla of evidence to support his assumption. Even though a summary judgment cannot usually be predicated on an inherently factual question, such as the absence of malice, the showing here is so clear and so factually uncontroverted that no inference of malice could permissibly be drawn.

### D. THE PLAINTIFF WAS NOT DEFAMED

■ In Louisiana, publications made in the course of judicial proceedings have only a qualified privilege, sometimes called a conditional privilege. See Comment, 1967, 28 La.L.Rev. 82, 93–94, Comment, 1945, 6 La.L.Rev. 281 (Part I), 417, 420 (Part II), and Comment, 1938, 12 Tul.L.Rev. 452. Hence the Louisiana rule has been stated succinctly:

> "The common law rule of absolute privilege in judicial pleadings is not the law of Louisiana. Here the privilege is qualified and subject to the rule that the allegation or comment must be material, with probable cause, and without malice." Sunseri v. Shapiro, La.App.1962, 138 So.2d 661, 662.

See also, Waldo v. Morrison, 1952, 220 La. 1006, 58 So.2d 210; Lescale v. Joseph Schwartz Co., 1906, 116 La. 293, 40 So. 708; Russo v. Kelly, La.App.1969, 228 So.2d 736; Oakes v. Alexander, La.

App.1961, 135 So.2d 513; Robinson Mercantile Co. v. Freeman, La.App.1937, 172 So. 797. The defense of privilege is recognized in both civil and criminal proceedings for defamation. See LSA–R.S. 14:49; State v. Lambert, 1938, 188 La. 968, 178 So. 508.

■ The "qualified" or "conditional" privilege enjoyed by a publication will be lost if the defamatory statement is published by a defendant "in the wrong state of mind." Prosser on Torts, § 110 at 821 (3 ed. 1964). "The word 'malice'," he continues, "which has plagued the law of defamation from the beginning, has been much used in this connection, and it frequently is said that the privilege is forfeited if the publication is 'malicious.' It is clear that this means something more than the fictitious 'legal malice' which is 'implied' as a disguise for strict liability in any case of unprivileged defamation. On the other hand, it may mean something less than spite, ill will, or a desire to do harm for its own sake; and, while there is authority to the contrary, it is the better and perhaps more generally accepted view that the mere existence of such ill will does not necessarily defeat the privilege. 'Malice' in this sense may subject the defendant to punitive damages if he is liable at all; but if the privilege is otherwise established by the occasion and a proper purpose, the addition of the fact that the defendant feels indignation and resentment toward the plaintiff and enjoys defaming him will not always forfeit it. Perhaps the statement which best fits the decided cases is that the court will look to the primary motive or purpose by which the defendant apparently is inspired. Discarding 'malice' as a meaningless and quite unsatisfactory term, it appears that the privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection. If the defendant acts chiefly from motives of ill will, he will certainly be liable; and the vehemence of his language may be evidence against him in this respect. But he will likewise be liable if he publishes his statement to accomplish a distinct objective, which may be legitimate enough in itself but is not within the privilege—as for example, to retain a servant in his employment, to obtain assistance in collecting a debt, or to increase the circulation of a newspaper." Id. at 821–822.

This also is the view taken by Professors Harper and James. The legal conception of malice that defeats the qualified privilege "must be some motive inconsistent with the social policy which gives rise to privilege and which affords prima facie immunity to the defendant. If it appears that the defendant has attempted to use the circumstances and the occasion for a purpose not within that for which the immunity is extended, the privilege is abused and he is liable. And this is as it should be. If the communication is [not made] for the purpose of protecting interests legally recognized, nor in the performance of a duty which the law encourages, 'the pretense under which it is made, instead of furnishing a defense, will aggravate the case.'" I Harper and James, The Law of Torts, § 5.27 at 452 (1956).

■ Legal pleadings need not be drawn with the delicacy prescribed in a Victorian book of etiquette. Fastidiousness is not an indispensable literary standard for framing the allegations of a document that, by definition, commences an adversary proceeding. Defendants may not be spitefully abused, but counsel are permitted to frame pleadings in language that goes beyond stereotyped hornbook forms.

■ This action for defamation must be dismissed not only because the allegations with respect to Kihneman are protected by the qualified privilege but also because, fairly read, the allegations about him made in the complaint and accompanying documents, when taken as a whole, were not defamatory. The threshold question in any defamation action is whether the words used are capable of a defamatory meaning. Although Louisiana's sparing use of

jury trials makes it difficult to determine from its reported opinions exactly what questions are legal ones, to be decided by the court or fact ones, to be decided by the jury, Louisiana would appear to follow the prevailing view that "whether the words used, are capable of a defamatory meaning" is a question of law for determination by the court, not a jury. See Albert Miller & Co. v. Corte, 5 Cir.1939, 107 F.2d 432, 434, applying Alabama law. Once the court concludes the words are capable of bearing a defamatory meaning, it becomes a jury question whether the words as applied to the plaintiff in fact defamed him.

 In deciding whether the words are capable of a defamatory meaning, the publication must be read as a whole. Otero v. Ewing, 1926, 162 La. 453, 110 So. 648; Tate v. Nicholson Pub. Co., 1908, 122 La. 472, 47 So. 774. The words must be construed according to the meaning that will be given them by reasonable individuals of ordinary intelligence and sensitivity. Their significance must not be distorted to give an unusual meaning, and they are to be understood only in the context in which they were used and in the manner shown by the circumstances under which they were used. Otero v. Ewing, 1926, 162 La. 453, 110 So. 648; Sterkx v. Sterkx, 1915, 138 La. 440, 70 So. 428; Flanagan v. Nicholson Pub. Co., 1915, 137 La. 588, 68 So. 964. See also, Gatley on Libel and Slander, Third Edition, 1938, quoted in Albert Miller & Co. v. Corte, 5 Cir. 1939, 107 F.2d at 434–435.

 Kihneman says he was defamed by the allegations in paragraphs 10 and 14 of Humble's complaint and those in its motion for injunctive relief, and in the affidavit in support of the motion. The words in paragraph 10 that Kihneman selects as defamatory are those that refer to him as one of "the unwitting tools of Harang's machinations."

The phrase "unwitting tool" can be read scornfully. The words carry no compliment, and they do hint at disparagement. There is little doubt that, given the second chance, Humble's counsel might now choose to use some other phrase; the words used were certainly stronger than institution of the suit required. But, taken in context, they do not accuse Kihneman of a wrongful act, or intimate in him any lack of integrity, business judgment or virtue. Read as a whole the allegations make it clear that Humble was not seeking to bathe Kihneman in an unfavorable light. A sensitive man might be wounded by the words used taken from context. They may have provided a barb for jest by those who delight in the discomforture of others. But this is not the test. The words are not literally untrue, nor are they, read in context, legally injurious.

Plaintiff places mistaken reliance on a Washington case, Ziebell v. Lumbermens Printing Co., 1942, 14 Wash.2d 261, 127 P.2d 677, in which a newspaper termed a public utilities commissioner a "confessed tool of Wall Street." The commissioner charged libel. On demurrers the Washington Supreme Court held the publication could be construed as libellous because it perhaps implied misconduct in office by a public official entrusted with a position of public interest. The publication could be held to impute to the commissioner "a lack of integrity and fidelity to his public trust", and thus "expose him to hatred, contempt, and obloquy, and to deprive him of the benefit of public confidence." 127 P.2d at 681. For this reason the lower court's order of dismissal was reversed and a trial on the merits was ordered.[5] Here Humble did not suggest

---

5. It is unlikely that the issues raised in *Ziebell* would be approached in the same way today in light of the Supreme Court's development of the First Amendment qualified privilege in the area of fair comment on public figures. See New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; St. Amant v. Thompson, 1968, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Curtis Publishing Co. v. Butts, 1967, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094;

that Kihneman was a conscious and "confessed tool" of Harang, but that he was interposed by Harang as an undisclosed agent in a fraudulent scheme of which Kihneman had no knowledge.

Additionally, Kihneman claims that he was defamed by Humble's allegations in paragraph 14 of the complaint and in its motion and affidavit seeking injunctive relief.[6] He asserts that he has been damaged, both in his personal and business life, by Humble's suggestion that he, an attorney bound by the code of ethics, would comply with Harang's commands to conceal or destroy documents or suppress evidence.

On November 10, 1969, the court interrogated the plaintiff in accordance with the provisions of Rule 56(d), Fed. R.Civ.Proc., requiring him to particularize his contentions and to disclose the evidence he relied upon. In answering these inquiries the plaintiff injected for the first time the allegation that he was also defamed and his privacy was invaded by the display of a letter by Humble's counsel to certain persons. The letter, dated August 14, 1962, evidences an agreement between Harang and Humble's ex-employee relative to acquisition of mineral interests in the Avondale Field. The only reference to Kihneman is as follows: "It will be necessary for us to acquire legal services * * * to consummate these agreements. I am employing the services of Mr. William J. Kihneman, my Attorney at Law, on a per-

centage basis rather than a per diem basis, the percentage basis being ten (10%) per cent of the gross derived." It is undisputed that the statements regarding Kihneman were true. Kihneman was asked by Harang to perform the services referred to in the letter and performed them. Kihneman admits receiving $9,500 as compensation for this work. Humble has never claimed that Kihneman committed any wrong in furnishing these services; Humble made no charge in its complaint in Civil Action 66–697 that would link Kihneman to the Avondale transaction. No action for defamation lies on this ground, not only because the statements are true, but also because the reference to Kihneman is incapable of a defamatory meaning. The evidence shows no invasion of Kihneman's privacy for the disclosure was requested in Kihneman's presence with his implied consent.

Taking together everything Humble said about Kihneman, in its complaint and in the accompanying documents, it is apparent that the total of what was said was true: he was Harang's attorney and agent, he would act at Harang's instruction relative to his agency, he was not knowingly involved in any improper conduct, and he was unwittingly being used by Harang. The only reason he was joined as a defendant was that he innocently held title for Harang's account. Humble stated emphatically (also in paragraph 10 of the complaint)

Garrison v. Louisiana, 1964, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; Time, Inc. v. McLaney, 5 Cir. 1969, 406 F.2d 565; Goldwater v. Ginzburg, 2 Cir. 1969, 414 F.2d 324.

See also, Bienvenu v. Angelle, 1969, 254 La. 182, 223 So.2d 140 (candidate for Parish Director of Public Welfare); Otero v. Ewing, 1926, 162 La. 453, 110 So. 648 (candidate for judgeship); Flanagan v. Nicholson Pub. Co., 1915, 137 La. 588, 68 So. 964 (union official, a New Orleans resident, referred to in article as a traitor to City of New Orleans, and a "dangerous and suspicious character"); Sas Jaworsky v. Padfield, La. App.1968, 211 So.2d 122 (candidate for state senate); Walker v. Associated

Press, La.App.1966, 191 So.2d 727 (Army General). *Cf.* Kennedy v. Item Co., 1948, 213 La. 347, 34 So.2d 886 (attorney involved in widely-publicized trial).

6. The allegations in paragraph 14 were contained in an "Alternative Fourth Count" that was included through clerical error in the original complaint filed in the Clerk's Office. The page on which it was included was omitted from the service copies and the extraneous page was deleted from the complaint by amendment after hearings in the Harang suit. The same allegations, however, are included in the motion and affidavit seeking injunctive relief that accompanied the original complaint.

that Kihneman and the other lease brokers were not charged with any wrongdoing. Humble did not allege that Kihneman would deliberately and knowingly suppress evidence. The complaint does not charge him with any specific unethical or illegal conduct.[7] The words Humble used must be squeezed from context before they can be considered defamatory, and even then they would appear disturbing only to a person of unusual sensitivity.

■ As evidence of his claimed defamation Kihneman has filed the affidavits of numerous individuals who assert that they are connected, either directly or indirectly, with the oil industry; they have known Kihneman for many years; and all conclude that Kihneman has been defamed as a result of Humble's allegations in the Harang suit. But these are mere conclusions apparently based on newspaper and other secondhand reports of the litigation. No affidavit shows that it was intended for use in this lawsuit, no affidavit shows that it was made on personal knowledge of the affiant, and no affidavit shows that the affiant had even read the complaint in Civil Action 66–697. Beyond this, the affidavits are inadmissible expressions of opinion without any foundation having been laid. Rule 56(e), Fed. R.Civ.Proc.

■ Humble's allegations are protected by the qualified privilege. In addition the words used are incapable of a defamatory meaning. It is therefore unnecessary to explore the full limits of the Louisiana statute that protects clients from libels uttered by their counsel in lawsuits. LSA–R.S. 13:3415. See Brooks v. Bank of Acadia, 1916, 138 La. 657, 70 So. 573 and Comment, 1938, 12 Tul.L.Rev. 452, 454 discussing R.S.1870, § 123, the predecessor of R.S. 13:3415.

This is not a case where an insult was deliberately visited. See Planchard v. Klaw & Erlanger New Orleans Theatres Co., 1928, 166 La. 235, 117 So. 132; Malczewski v. New Orleans Ry. & Light Co., 1924, 156 La. 830, 101 So. 213; Haile v. New Orleans Ry. & Light Co., 1914, 135 La. 229, 65 So. 225; May v. Shreveport Traction Co., 1910, 127 La. 420, 53 So. 671. See also, generally, Annot., 15 A.L.R.2d 108 (1951) "Civil liability for insulting or abusive language not amounting to defamation." Louisiana's public policy shelters even defamatory remarks in legal pleadings with a privilege. Louisiana's courts would therefore certainly decline to recognize a cause of action for the use of nondefamatory words in a legal pleading even though they wound sensitive skin.

For these reasons, summary judgment is rendered in favor of Humble against Kihneman, dismissing Kihneman's suit.

7. Compare, Newby v. Times-Mirror Co., 1920, 46 Cal.App. 110, 188 P. 1008 (newspaper article and cartoon portrayed attorney as hypocrite and accused him of habitual alteration of public records); Gladney v. DeBretton, 1950, 218 La. 296, 49 So.2d 18 (statements to reporter that attorney would be searched each time before entering jail containing dangerous prisoners); Kennedy v. Item Co., 1948, 213 La. 347, 34 So.2d 886 (newspaper editorial questioned professional competency of attorney and referred to him as a "pettifogger * * * mischievously bent on impeding a great reform demanded by the people * * * "); Otero v. Ewing, 1926, 162 La. 453, 110 So. 648 (candidate for judgeship charged with association with notorious criminal and receipt of weekly payments from gamblers and criminals); Dimitry v. Levy, 1926, 161 La. 11, 108 So. 107 (petition charged attorney with fraud and conspiracy).