**Alice Neilson STEPHENS et al.**

**v.**

**BROWN & ROOT, INC.**

**Civ. A. No. 13314.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

June 21, 1971.

William E. Skye, Alexandria, La., for plaintiffs.

Richard B. Sadler, Jr., Alexandria, La., William A. Brown, Houston, Tex., for defendant.

EDWIN F. HUNTER, District Judge:

This subject matter has been with us for some time. It has its genesis when Brown & Root (Brown) sued O. R. Stephens and others (Civil Action No. 8166–A), alleging anti-trust violations. Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662 (5th Cir., 1967). Prior to the trial counsel for Brown notified the Court that it did not care to prosecute its anti-trust claim unless it was necessary to do so to provide a defense to threatened malicious prosecution claims. The anti-trust case was tried to a jury. The Court directed a verdict for Stephens. The present suit for malicious

prosecution followed. The case was set for trial on June 16, 1969 and was continued at the request of the plaintiffs. Various and sundry motions have been presented. Subsequently, plaintiff O. R. Stephens passed away and his heirs were substituted as parties plaintiff. This resulted in further motions as to the survival of the action.

On January 17, 1971 we acknowledged that the survival issue presented a case of first impression involving Article 428 of the Louisiana Civil Code of Civil Procedure and its companion statute, Article 2315 of the Louisiana Civil Code, then proceeded to deny Brown's motion. In doing so we also dismissed Brown's second motion for summary judgment. Our denial was pegged on the belief that the issue of probable cause was for the jury.

Defendant's second motion for summary judgment must be re-examined insofar as it pertains to advice of counsel as a defense. Defense counsel's brief submitted with this motion dealt exhaustively with various issues and the particular issue was obscured in the mass of material. The motion was inspired largely by Kihneman v. Humble Oil and Refining Company, (E.D.La.1970), 312 F.Supp. 34. This opinion is a scholarly compilation of the Louisiana Law. Kihneman combined three separate actions: (1) invasion of privacy; (2) malicious prosecution; and (3) defamation by judicial pleadings. The Court granted summary judgment primarily on affidavits of Humble's attorneys, holding:

(1) "Litigants are encouraged to seek the courts to remedy their supposed wrongs, and the unsuccessful suitor is not to be held in damages merely because he was mistaken in his belief that he had a proper case."

(2) "But here again the policy that good faith litigation should not be discouraged protects even defamatory publications with a qualified privilege. This same policy permits the action for malicious prosecution only when, as the name of the Action implies, the prosecution originated in motives that the law deems malignant."

(3) "At common law, the privilege with respect to allegations in judicial proceedings . is absolute * * * Hence at Common law the sole remedy with respect to improper use of the courts is malicious prosecution, * * Louisiana recognizes a civil action for malicious prosecution, but only when 'a clear case * * * (is) established or where justice has been perverted for the gratification of private malice."

(4) " * * * where a litigant has made full disclosure to his attorney and has acted on his attorney's advice honestly and in good faith, the action for malicious prosecution will not lie * * * 'Advice of counsel, even though erroneous, when accepted and acted on by the client in good faith, is a shield against charges of malice and bad faith' (citation). Here there is no showing that the defendants used the occasion for suing Harang to join Kihneman for any purpose other than to protect Humble's legal interests. Humble acted on the advice of counsel; it had probable cause to sue Kihneman."

(5) "There is no suggestion of any evidence whatsoever that Humble or any of its counsel bore any ill will toward the Plaintiff. In this respect Kihneman said only that malice "must" have existed because there was no other reason to sue him. But he suggests not a scintilla of evidence to support his assumption. Even though a summary judgment cannot usually be predicated on an inherently factual question, such as the absence of malice, the showing here is so clear and so factually uncontroverted that no inference of malice could permissibly be drawn."

(6) "In Louisiana, publications made in the course of judicial proceedings have only a qualified privilege, sometimes called a conditional privilege. * * * 'The common law rule of absolute privilege in judicial proceedings

is not the law of Louisiana. Here the privilege is qualified and subject to the rule that the allegation or comment must be material, with probable cause, and without malice.' "

(7) " * * * the privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection * * * Defendants may not be spitefully abused, but counsel are permitted to frame pleadings in language that goes beyond stereotyped lawbook forms."

In Brooks v. Bank of Acadia, 138 La. 657, 70 So. 573, 575 (1916), the Louisiana Supreme Court said:

"Advice of counsel, even though erroneous, on questions of law, when accepted and acted on by the client in good faith is a shield against charges of malice and bad faith."

When we granted a directed verdict for O. R. Stephens in Civil Action 8166–A, counsel for Brown & Root argued a corporate merger theory under 15 U.S.C.A. Section 18, that the sale by O. R. Stephens and Stephens Gravel Company to Central Sand & Gravel Company of the Stephens-Big Rock pit, its leases, deposits and equipment, was an anti-trust violation because "the effect of such acquisition may be (was) substantially to lessen competition or to tend to create a monopoly * * *." We did not agree and rejected Brown's contention, saying:

"Not every acquisition of the assets of the corporation is illegal, but it is illegal if the effects of the acquisition is less than the effect * * * in lessening competition. Of course, if that is the law, then *Mr. Brown is entitled to a directed verdict in this case.* So, I don't think that's anything to submit to the jury on that." (Tr. 1388)

On appeal, Brown & Root urged this legal position in its Second Specification of Error (see 383 F.2d 665), but the Court of Appeals avoided decision of the anti-trust question because: "The Appellant, Brown & Root, by brief and oral argument, disclaims any desire for recovery of a money judgment and avows that its only desire is to procure a declaratory judgment that will protect it against liability for malicious prosecution to those against whom it asserted the anti-trust claim."

The Supreme Court of Louisiana in Eusant v. Unity Industrial Life Ins., etc. (1940), 195 La. 347, 196 So. 554, said:

"It is the settled jurisprudence of this court that 'Where a party has communicated to his counsel all the facts bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence or inquiry, and has acted upon the advice received honestly and in good faith, the absence of malice is established, the want of probable cause is negatived, and the action of malicious prosecution will not lie; and a fortiori is this the case where the counsel consulted is the public prosecutor." Sandoz v. Veazie, 106 La. 202, 30 So. 767. 'Probable cause does not depend upon the actual state of the case in point of fact, but on the honest and reasonable belief of the party prosecuting.' "

To the same effect, see Sandoz v. Veazie (1901), 106 La. 202, 30 So. 767; Blanchard v. Employers Liability Assurance Corporation, (La.App.1967), 197 So.2d 386; Graham v. Interstate Electric Co., (1930) 170 La. 392, 127 So. 879; Glynn v. Le Normand, 80 So.2d 896 (La.App. 1955); Gould v. Gardner, Sager & Co. (1853) 8 La.Ann. 11. These decisions require that the then plaintifff seek the advice of counsel in good faith, without misrepresenting the facts or withholding a known material fact. Most cases dealing with this aspect of the advice-of-counsel defense, are criminal rather than civil. See quotation from Eusant v. Unity Industrial Life, Ins., etc. (1940) 195 La. 347, 196 So. 554.

Thus, if it be shown that defendant knowingly misrepresented the facts to his counsel, the defense does not avail. In Bladgy v. Giacomino (1930) 170 La. 638, 128 So. 661, the now defendant charged plaintiff with embezzling prop-

erty which the now defendant knew he did not own. But it is abundantly clear that the actual state of facts do not control, but the then plaintiff's honest and reasonable belief as to the facts. In Blanchard v. Employers Liability Assurance Corp. (La.Ct.App.1967), 197 So.2d 386, the Court recited the established rule from Eusant v. Unity, etc., supra, that: "Probable cause does not depend upon the actual state of the case in point of fact, but on the honest and reasonable belief of the party prosecuting," and followed by saying:

"In the instant case there are no direct nor positive averments to show the defendants in instituting the damage suits aforesaid were actuated by malice. Furthermore, in the absence of affirmative allegations to the contrary, the claimants will be presumed to have acted on advice of counsel and not without probable cause."

■■■ Defendant accompanied its second motion for summary judgment with affidavits by the lawyers, describing the research undertaken, together with their facts, setting forth their belief that the facts as found were true and specifically denying that they were in any way animated by malice towards plaintiff. [These affidavits reveal that Brown acted on its attorneys advice and the law seems clear that advice of counsel, even though erroneous, when accepted and acted on by the client in good faith, is a shield against charges of malice and bad faith.] The affidavits filed by William A. Brown and Nauman S. Scott are appended hereto and made a part hereof. Plaintiff, in effect, relied on his pleadings and the former proceedings in this Court to create an issue of fact. No such issue is created on this record as to the advice of counsel. Under Rule 56(e) the plaintiffs may not avoid the entry of summary judgment against them by relying on their pleadings. Piper v. United States (5th Cir., 1968), 392 F.2d 462; Liberty Leasing Co. v. Hillsum Sales Corp. (5th Cir., 1967), 380 F.2d 1013, 1015. There can be no doubt but that on the record

Brown & Root was advised by counsel and acted on that advice in filing the initial suit against Mr. O. R. Stephens. Under all the authorities there is no issue of fact to be decided by a jury on this issue, and summary judgment must be granted as it was in Kihneman v. Humble.

Motion for summary judgment this day granted.

## APPENDIX

### AFFIDAVIT OF

### NAUMAN S. SCOTT

STATE OF LOUISIANA
PARISH OF RAPIDES

Before me, the undersigned authority, a Notary Public duly commissioned and qualified in and for the Parish and State aforesaid, there came and appeared NAUMAN S. SCOTT, who, having been duly sworn, did depose and say that:

I am NAUMAN S. SCOTT, a life-long resident and citizen of Alexandria, Louisiana. I am a graduate of Tulane University Law School and was admitted to practice in the State of Louisiana in the year 1943, although I did not begin actual practice of law until the termination of my military service in December, 1945. I began in the offices of LeDoux R. Provosty in Alexandria, Louisiana, on January 1, 1946. On January 1, 1947, I entered into partnership with LeDoux R. Provosty and Richard B. Sadler, Jr. to form the partnership of Provosty, Sadler & Scott, and have continued to practice with the same firm until the present date. I am admitted to practice and have practiced before the State District Courts of Louisiana, all the Louisiana Courts of Appeal and Louisiana Supreme Court. I am also admitted to practice and have practiced before the District Courts of the Eastern and Western Districts of Louisiana and the United States Court of Appeals for the Fifth Circuit. I am a member of the Alexandria, the Louisiana State and American Bar Associations. I am attorney of record for Brown & Root, Inc. in this action and

was attorney of record for Brown & Root, Inc. in Civil Action No. 8166–A in the United States District Court for the Western District of Louisiana, styled Brown & Root, Inc. vs. Richard Coco, et al and in the same case on appeal as No. 22,895 in the United States Court of Appeals for the Fifth Circuit, styled Brown & Root, Inc. vs. Big Rock Corporation, et al.

Late in the year 1960, I was retained by Brown & Root to defend several suits involving claims by employees and suppliers of subcontractors of Brown & Root on the Old River Project, in which Brown & Root was named defendant. All of the evidence and information necessary for the defense of these suits was obtained by me through Mr. William A. Brown of Houston, Texas, who was the attorney for Brown & Root, Inc. handling the legal affairs related to the Old River Project. In telephone conversations and conferences with Mr. Brown regarding these claims and other impending claims, I acquired a general understanding of the history of the Old River Project, including the various contracts between Richard Coco, et al and Brown & Root, the sources of aggregate being produced, the identity of the persons who had dedicated their services and resources to the performance of the contract, the failures encountered in the performance of the contract, the assumption of operations at the Stephens pit by La-Tex Marine, a subsidiary of Brown & Root. At this time, I also became aware of various claims of laborers, materialmen, creditors and other third parties against the individuals who had attempted to perform the aggregate contract and certain claims which they had against each other as is more particularly related in the affidavit of William A. Brown, filed in these proceedings.

Sometime in the early February, 1961, Mr. Brown telephoned me and stated that Brown & Root had arranged to buy aggregate from other parties and other sources, that the La-Tex operations at the Stephens-Big Rock pit would be halted and that it would be necessary to return possession of the Stephens-Big Rock pit to the Big Rock Group. He stated that he was telephoning David Sheffield, attorney for the Group, to arrange a meeting in Alexandria and asked if the facilities of my office could be utilized for this purpose. The meeting was held on February 18, 1961. Mr. Brown brought Mr. J. E. Quillen, Project Manager of the Old River Project, to the meeting with him. The three of us represented Brown & Root. Mr. Sheffield brought Messrs. Coco, Waller, Brezner, Connell, and O. R. Stephens, who were present for the Big Rock Group. Mr. Brown explained that La-Tex Marine had taken over the operation of Stephens-Big Rock pit on November 2, 1960, when it was no longer economically feasible for Lake Pearl to operate it. Since that time, Brown & Root had been able to arrange for the purchase of aggregate from another source, that the operations by La-Tex Marine were no longer necessary and had been discontinued on February 15, 1961. He explained further that the Stephens-Big Rock pit was no longer a necessary source of aggregate for the Old River Project except for a small amount of aggregate which would not be required for many months. Therefore Brown & Root wished to be relieved of the custody of the pit and the tools, machinery, equipment located thereon and wished the Group to designate the person or persons to whom custody and possession should be transferred and with whom a formal and complete transfer could be arranged. The owners of the pit could, thereafter, resume normal operations without obligation to Brown & Root except that they should make available a small amount of aggregate necessary to complete Monolith 12 some ten or twelve months later. Mr. Sheffield responded for the Group. He stated that he considered the advance payment on aggregate made by Brown & Root (amounting to more than $5,000.00 per month) was rent for which Brown & Root was liable until termination of the contract. If Brown & Root expected to take a small amount of aggregate for

Monolith 12, it would have to pay the full rent for the intervening ten or twelve months. If Brown & Root relinquished possession of the pit, it would also relinquish all rights to the stock piles of aggregate owned by it and paid for with funds advanced by Brown & Root to the Group. No solution regarding the custody of the pit was reached.

After the failure of the February 18th meeting, I conferred again with Mr. Brown. On this occasion he related to me the circumstances surrounding the bidding and awarding of the contracts to supply aggregate to the Old River Project, including the availability of sources, the ownership of sources, the identical amounts of bids, the paucity of bids, the circumstances of production and transportation which should have made the bids dissimilar, the awarding of the purchase contract to Lake Pearl, the attempted performance of the contract by persons with whom Brown & Root had no contractual relationship, namely Central Sand & Gravel Company and others owning different aggregate sources in the area; the purchase of the Stephens pit by Central Sand (which) had been designated by Richard Coco as the source of the aggregate which he would supply to the Old River Project and the other facts regarding the awarding and the performance of the purchase order which is set out in more detail in the affidavit of Mr. William A. Brown, which is being submitted in conjunction with this affidavit.

Mr. Brown related that the bids, in the opinion of Brown & Root, were unreasonably high and that, as a result, the purchase order awarded to Lake Pearl was also unreasonably high; that Brown & Root had lost a great deal of money on the contract and that its losses had been multiplied by the failure of the Group to perform and that continued custody and possession of the Stephens-Big Rock pit would greatly increase Brown & Root's losses. Failure of the Big Rock Group to perform had forced Brown & Root to complete the aggregate contract at a cost of approximately $100,000.00, and Brown & Root had paid in advance for aggregate still stock-piled at the Stephens-Big Rock pit, but which would be claimed by the Big Rock Group if Brown & Root failed to continue payments of $5,000.00 per month, plus the additional expense of acting as custodian of the Stephens-Big Rock pit. Based on the facts as related to me, I was of the opinion that there was sufficient evidence to support an action in anti-trust against the defendants named in Civil Action No. 8166–A. It was agreed that I would secure the necessary information regarding the names and addresses of the parties and the information available from the public records of Avoyelles, Grant and Rapides Parishes, such as Articles of Incorporation, recorded contract, acts of sale, mortgages and etc. which might be of record. Mr. Brown, who had command of the other facts in detail, agreed to make a first draft of the proceedings. These matters were accomplished and the final draft was completed in my office and filed on or about March 16, 1961.

Although Brown & Root failed in its antitrust action, I have never doubted that it had good and sufficient evidence to prosecute a suit in anti-trust against the defendant cited in Civil Action No. 8166–A and concurred with Mr. Brown in so advising Brown & Root. This conclusion is supported by the fact that, after all the evidence was in, the case, except for O. R. Stephens and Stephens Gravel Company, went to the jury, was considered without coming to a verdict for several hours; the foreman returned stating that he did not think that the jury could reach a verdict. On instructions of the court, the jury considered the case again, finally reaching a verdict for the defendants. *The question is not whether Brown & Root had sufficient cause and evidence to bring an anti-trust suit, but whether it had sufficient cause and evidence to join O. R. Stephens with the other defendants in Civil Action No. 8166–A.* Frankly, it never occurred to me that O. R. Stephens should not be joined as a defendant. The only fact known to Brown & Root prior to bring-

ing the anti-trust suit which would tend to divorce O. R. Stephens from the plans and activities of the other defendants is that he was not a stockholder in Big Rock Corporation. However, he did perform the following acts in concert or conjunction with one or more of the other defendants. He was hired as a commission salesman after his pit had been sold to the Big Rock Group; his acts in the promotion of the sale of aggregate certainly fostered the impression that he was acting in concert with the other defendants; and he had a direct pecuniary interest in every yard of gravel sold from the Stephens-Big Rock pit. The evidence in Civil Action No. 8166–A establishes that he performed the following acts in connection with the venture:

a. On June 18, 1959, the Corps of Engineers held a pre-bid conference attended by O. R. Stephens, C. E. Waller, Richard Coco and other suppliers in the gravel industry (admissions by all three).

b. No bid to supply aggregate was made by O. R. Stephens or Stephens Gravel Company on July 22, 1959, though the Stephens-Big Rock pit was the only pit designated as a source of aggregate by persons acting for the Big Rock Group.

c. The sale of the Stephens-Big Rock pit from Stephens Gravel Company, Inc. to the Big Rock Group (including Stephens' competitors, C. E. Waller and Richard Coco) was made on June 30, 1959, approximately twelve (12) days after O. R. Stephens, C. E. Waller and Richard Coco had attended the prebid conference of the Corps of Engineers, and before Waller had submitted a bid for Central Sand.

d. Under the provisions of that act of sale, O. R. Stephens was appointed Commission Agent for the purchaser and was to receive a commission for "services rendered and/or to be rendered by him", as follows: .

"In addition, Central shall pay to O. R. Stephens, individually, as the commismission or brokerage for *services rendered and/or to be rendered by him to Central for a period of five years*

*from the date of this instrument,* the following further amounts: Five (5¢) Cents per cubic yard on gravel, Five (5¢) Cents per cubic yard on sand and Five (5¢) Cents per cubic yard on pit-run. The royalties and commissions shall become due and payable on or before the fifteenth of the month following the month of production on the lands covered by said leases, as well as any renewals or supplements thereto. Central shall keep daily records which shall be at all times available to the inspection of Stephens, O. R. Stephens individually, their respective heirs, successors, authorized representatives or assigns."

e. This purchase by Waller and all of his other acts relating to the Old River Project were performed by Waller on behalf of the Big Rock Group.

f. O. R. Stephens and C. E. Waller, together, made a trip to Houston, Texas, shortly after July 22, 1959 and after Stephens had sold the pit to Central Sand, in an attempt to induce Brown & Root to accept the Central Sand (Big Rock Group) bid.

g. O. R. Stephens attended the meeting of the Big Rock Group at which Richard Coco revealed the Lake Pearl purchase order, and other meetings of the Big Rock Group held before and after that time (Porter).

h. O. R. Stephens was represented as being an interested party in the attempt to get Corps of Engineer approval for small aggregate to be supplied for the Stephens-Big Rock pit (Gravel letter to Senator Long and McSween letter to Gravel, P. Ex. 53 & 50).

i. Stephens Gravel Company, Inc. and O. R. Stephens, as mortgagee and as owners of royalties, overriding royalties and commissions, had an obvious interest in securing orders for the owners of the Stephens-Big Rock pit and in maintaining a high rate of production from the pit. This interest was brought forcibly to the attention of Brown & Root after July 2, 1960 and these interests were the principal reason why it was neces-

sary to revise the July 2, 1960 contract on August 3, 1960.

j.  O. R. Stephens was present with members of the Big Rock Group at the meeting of November 2, 1960, after which Brown & Root took possession of and operated the Stephens-Big Rock pit.

k.  O. R. Stephens was present with members of the Big Rock Group at the meeting of February 18, 1961, in which Brown & Root attempted to relinquish possession of the Stephens-Big Rock pit.

l.  Brown & Root also discovered that Stephens Gravel Company or Stephens equipment was being utilized by the Big Rock Group in the Stephens-Big Rock pit and in the Paradise Pit of Central Sand which was producing sand for the Group.

m.  In all matters relating to Brown & Root prior to suit, Stephens was represented, in common with the Big Rock Group, by the firm of Gravel & Sheffield.

n.  On all occasions in which Brown & Root came into contact with O. R. Stephens, he was acting in concert and cooperation with the other defendants to Civil Action No. 8166–A.  Plaintiff had every reason to believe that he was an active member of the Big Rock Group even though he was not a stockholder in the Big Rock Corporation.

Insofar as Brown & Root was concerned, O. R. Stephens made more appearances and performed more acts in connection with the solicitation and performance of the purchase order for the Big Rock Group than any of the defendants except Richard Coco and C. E. Waller, Sr.  Brown & Root possessed far more evidence to show O. R. Stephens' connection with the activities of the Big Rock Group than it had to connect Barnet Brezner, Al Jortner, George Connell, J. W. Williamson, Camille·Gravel, John Porter or H. J. Quartermont with the action.  Brown & Root had little evidence against most of these persons, except that they were stockholders in the Big Rock Corporation.  Certainly, if these parties were properly joined, O. R. Stephens could not have been omitted.

Under the circumstances, Brown & Root would have been ill-advised if it had not made Stephens a party to the anti-trust action.  He made similar protests and *claimed the same damages against Brown & Root as a result of his joinder in the interpleader phase of the suit.*  He was properly joined in both.  The only difference is that Brown & Root lost the anti-trust action.

Thus done and signed before me, Notary, and the undersigned competent witnesses in my office in Alexandria, Louisiana, on this the 29th day of September, 1970.

WITNESSES:

(s) Marjorie Stephens    (s) Nauman S. Scott

(s) Elaine Davis    NAUMAN S. SCOTT

(s) Lessie Mobley

NOTARY PUBLIC

## AFFIDAVIT OF WILLIAM A. BROWN

THE STATE OF TEXAS
COUNTY OF HARRIS

Before me, the undersigned authority, on this day personally appeared WILLIAM A. BROWN, known to me, who being duly sworn, on his oath deposed and said:

1.  *Identity*

My name is WILLIAM A. BROWN. I am a resident and citizen of the State of Texas and reside in Houston, Texas. I graduated from the School of Law of the University of Texas in 1948.  I was admitted to practice by the Supreme Court of Texas in 1948, and I have been admitted to practice in the United States District Courts for the Western and Southern Districts of Texas and specially admitted in the United States District Court for the Western District of Louisiana.  I am admitted to practice in the United States Court of Appeals for the Fifth Circuit at New Orleans, Louisiana.  I am a member of the State Bar of Texas, Houston Bar Association and American Bar Association. I formerly engaged in the practice of law in Austin, Texas as a partner in the law firm of Powell, Wirtz, Rauhut &

McGinnis, and I am now engaged in the practice of law in Houston, Texas as a partner in the law firm of Powell, Brown & Maverick. I am also Associate General Counsel of Brown & Root, Inc., a position I have held since 1961. I am Attorney of Record for Brown & Root, Inc., in the above action and I was attorney of record for Brown & Root, Inc., in Civil Action No. 8166–A in the United States District Court for the Western District of Louisiana, styled Brown & Root, Inc. vs. Richard Coco, et al and in the same case on appeal as No. 22,895 in the United States Court of Appeals for the Fifth Circuit, styled Brown & Root, Inc. v. Big Rock Corporation, et al.

I have been closely connected with legal problems related to the Old River Navigation Lock project performed by Brown & Root, Inc. for the United States Army Corps of Engineers since the inception of that project in 1959 and continuing to the present time. I personally negotiated many of the contracts and have participated in all of the litigation arising from the project, except damage claims covered by insurance. I met each of the parties involved in Civil Action 8166–A in connection with my handling of the aggregate supply problem on the Old River Project, and had not known any of them prior to my association with the Old River Project.

### 2. Events of Spring, 1960

Several months after the award by Brown & Root, Inc., to Lake Pearl Sand & Gravel Company of the purchase order for the concrete aggregate for the Old River Project I talked by long distance telephone from Houston, Texas on March 11, 1960 with Camille F. Gravel, Jr., in Alexandria, Louisiana, one of the owners of Big Rock Corporation, as attorney representing Lake Pearl Sand & Gravel Company. On March 21, 1960, I conferred in Houston with Camille Gravel, Richard Coco of Lake Pearl Sand & Gravel Company, and Ed Waller of Central Sand & Gravel Company, for the gravel suppliers, and James Quillen, Brown & Root's Project Manager, and Willis Powell, Brown & Root's Vice President. These conferences were concerned with the failure of Lake Pearl Sand & Gravel Company to furnish stockpiles of aggregate meeting specifications and from sources approved by the United States Corps of Engineers. In these conferences, Messrs. Gravel, Coco and Waller said that there was a group of nine persons who joined together to purchase the Stephens Gravel Company gravel pit and that the members of the group had various other gravel companies and gravel deposits from which the materials would be supplied if the United States Corps of Engineers rejected the primary source. We were told that sources available to the group included (1) the Stephens Gravel Company's Pollock pit; (2) the Central Sand & Gravel Company's Paradise pit; (3) the Lake Pearl Sand & Gravel Company's Avoyelles Parish pit and Turkey Creek pit; and that all these pits were available through the respective corporations and individuals participating in the group. Thereafter, Mr. Gravel sought to reverse the ruling of the United States Corps of Engineers rejecting the ¾″ gravel from the Stephens Gravel Company pit, including appeals for assistance from the United States Senators and Congressmen. Correspondence (in evidence in Case 8166–A as Plaintiff's Exhibit 50) was furnished me listing O. R. Stephens as one of the local constituents interested in having the Stephens Gravel Company pit approved as a source of ¾″ gravel to supply the Brown & Root, Inc. Contract.

### 3. Market Survey Information

In connection with Brown & Root's consideration of the problems related to the failure of Lake Pearl Sand & Gravel Company to furnish materials meeting specifications, private discussions were held among Brown & Root officials and me, in the Spring of 1960, regarding alternative sources for the material in the event Lake Pearl Sand & Gravel were unable to perform its contract. I was

given the following information in these discussions:

Before awarding the aggregate supply contract to Lake Pearl Sand & Gravel Company, Brown & Root, Inc., had conducted a market survey to determine alternate sources from which to obtain the aggregate at a price which it considered fair market value and in line with the quoted price which it had relied upon in preparing its fixed price bid on the Old River Navigation Lock to the Corps of Engineers. I was told about this survey in connection with the consideration of alternative courses of action at the time when the Corps of Engineers was rejecting the sources of ¾" gravel proposed by Lake Pearl. I was told that the survey showed there were only two certainly reliable sources: (1) St. Catherine Gravel Company, which had submitted an unreasonably high bid, and which had the material produced and stockpiled ready for delivery, having been produced by hydraulic dredging from deposits in the Mississippi River near Natchez, and (2) T. L. James & Company which owned a deposit and stockpile near the project, but which company was a competitor of Brown & Root, Inc. and one of the general contractors bidding on the Old River Project, and not a gravel company, and this source was not available on the market. I was told that Holloway Sand & Gravel Company and Lambert Gravel Company, had combined with St. Catherine's Gravel Company to submit a single joint bid. I was told that the ability of Guarisco Construction Company, near St. Francisville, to produce was doubtful and its price was also unreasonably high; that Witte Sand & Gravel Company, also near Pollock, had the ability to produce but was not interested in the contract; and that other approved sources listed in the Contract Documents for the Old River Project were unable to supply the material. I was told that the Stephens Gravel Company pit at Pollock had deposits of both ¾" and 1½" gravel that could be produced in sufficient quantity to meet specifications if the plant were properly equipped and operated, and that the sand could be produced from any of several sources proposed by Lake Pearl, but that the rejection by the Corps of Engineers of the ¾" gravel from the Stephens-Big Rock pit rendered production of 1½" gravel only, from that pit, uneconomical. In net result I was told that the survey indicated that there was no other available and reliable source of the concrete aggregate except St. Catherine Gravel Company which was demanding an unreasonable price.

I was told that during the bidding, award and mobilization period, unusual pricing practices had occurred. Only three (3) suppliers submitted aggregate proposals to Brown & Root for use in preparing its bid price to the Corps of Engineers for the Old River Project. Some of the quotations were expressed in tons and some in cubic yards and standard conversion factors were used to convert the quotations to a comparable basis. The three aggregate quotations received before the bid date, expressed in cubic yards, were:

|  | Gravel — Cubic Yard | | Sand |
|  | 1½" | ¾" | Cubic Yard |
| --- | --- | --- | --- |
| St. Catherine Gravel Co.. | $4.80 | $4.80 | $4.50 |
| Central Sand & Gravel | 4.80 | 4.80 | 4.50 |
| Guarisco Construction Co. | 4.20 | 4.20 | 4.00 |

I was told that the Brown & Root, Inc. bid price for the Old River Project was based on the aggregate prices quoted by Guarisco Construction Company, the low aggregate bidder. After Brown & Root, Inc., was awarded the Old River Lock Project, Brown & Root notified Guarisco Construction Company of its intent to award Guarisco Construction Company the aggregate Supply Contract, whereupon Guarisco responded that its price would be changed to:

|  | Gravel — Cubic Yard | | Sand |
|  | 1½" | ¾" | Cubic Yard |
| --- | --- | --- | --- |
| Revised Guarisco Construction Co. | $4.80 | $4.80 | $4.50 |

It was observed by all Brown & Root officials participating in these discussions that the revised Guarisco proposal

made all three sets of prices substantially identical; that there is no established market at the site of the Old River Project; that the material was to be produced from three distinct and separated sources having differing production costs; that transportation costs from the production points to the job site were obviously quite different. I was told that the price appeared unreasonably high and that a price of $4.10 for gravel and $3.60 for sand represented fair market value.

The aggregate supply contract was awarded to Lake Pearl Sand & Gravel Company, who proposed to supply the material from the Stephens-Big Rock pit, the same pit from which Central Sand & Gravel had proposed to supply the material. The contract price for the aggregate to Lake Pearl Sand & Gravel Company was $4.43 cu. yd. for gravel and $3.90 cu. yd. for sand. After awarding this contract it was disclosed that Lake Pearl Sand & Gravel Company (or its owner Richard Coco) was in combination with Central Sand & Gravel Company (or its owner Ed Waller) and others in ownership of the pit of Stephens Gravel Company at Pollock, from which the aggregate was to be supplied and that the various gravel deposits of all these corporations and individuals were available to assure performance of the contract.

On the basis of this information I advised Brown & Root, Inc. that it appeared there had been an illegal combination to restrict competition for concrete aggregate for the Old River Project and to fix the price otherwise than by free competition, and that this constituted a violation of the anti-trust laws and gave rise to an action for damages I was told that Brown & Root, Inc. did not wish to institute such a suit at that time and would not bring such a suit if the contract entered into with Lake Pearl Sand & Gravel Company was performed.

Arrangements were made by Lake Pearl Sand & Gravel Company, independently of Brown & Root, Inc., to supply aggregate meeting specifications from sources made available to it by members of the group of participants in Big Rock Corporation and by contract with an unrelated source (Gifford Hill & Company) for the ¾″ gravel. Brown & Root, Inc., was not a party to these arrangements. Lake Pearl Sand & Gravel Company performed satisfactorily under these arrangements until July, 1960.

4. *Contracts of July 2, 1960*

In late June, 1960, Lake Pearl Sand & Gravel Company failed to supply aggregate as required for the construction work. Brown & Root, Inc.'s Project Manager, J. E. Quillen, Brown & Root's Vice President, Willis Powell, and I inquired of Richard Coco of Lake Pearl Sand & Gravel Company as to the nature of the problem, the arrangements under which performance was being undertaken, and possible steps that could be taken to accomplish performance. We learned from Mr. Coco that all of the aggregate was being supplied from sources with which Brown & Root, Inc. had no direct contractual relationship, but some of which were in the group, referred to as the Big Rock Group, that had formed Big Rock Corporation. It was explained that the 1½″ gravel was being supplied from the Stephens Gravel Company pit at Pollock by Big Rock Corporation; that the sand was being supplied by Central Sand & Gravel Company from its Paradise pit; and that the ¾″ gravel was being purchased by the Big Rock Group from Gifford Hill Company at its Turkey Creek Plant. Arrangements were made for a meeting of all participating parties in Alexandria on July 1 or 2, 1960.

On July 1 and 2, 1960 I attended on behalf of Brown & Root, Inc., with J. E. Quillen and Willis Powell of Brown & Root, Inc., a meeting with representatives of the Big Rock Group, including Richard Coco, Ed Waller, Barnett Brezner and perhaps others, and David Sheffield (law partner of Camille Gravel) as attorney for the Big Rock Group and Bert Willis as an attorney and officer

of Central Sand & Gravel Company and a representative of Gifford Hill & Company. This meeting was held in Alexandria in the law offices of Camille Gravel and his partner David Sheffield. On behalf of Brown & Root, Inc., I called on the various members of the Big Rock Group and their respective corporations to enter into a contract directly with Brown & Root, Inc., providing that the deposits, plants, and facilities be dedicated to performance of the Lake Pearl Sand & Gravel Company aggregate supply contract; that they would cooperate with and assist Lake Pearl in performance of its aggregate supply contract on terms agreed upon between themselves; and that they would perform directly for Brown & Root, Inc., in the event of default of Lake Pearl. The persons present agreed and a contract was executed which is Plaintiff's Exhibit 3 in C.A. 8166–A. A separate agreement was made with Gifford Hill & Company, which was supplying the ¾″ gravel under contract with the Big Rock Group.

Production continued under the contract of July 2, 1960 until the operations of the Stephens Gravel Company pit was stopped or threatened to be stopped about August 3, 1960 by O. R. Stephens of Stephens Gravel Company.

### 5. *The Contracts of August 3, 1960*

I was absent from the country on vacation when a further crisis developed on August 3, 1960. Upon my return I was told by officials of Brown & Root, Inc., that Stephens Gravel Company, through its president O. R. Stephens, and its Vice President R. R. Saunders, had threatened to foreclose its purchase money mortgage on the "Stephens-Big Rock" gravel pit at Pollock being used by the Group as the source of 1½″ gravel, for non payment of installments due by Central Sand & Gravel Company, unless it received immediately the sum of $24,066.01. I was told that an Austin, Texas attorney, B. D. St. Clair, on behalf of Brown & Root, Inc., accompanied by other Brown & Root officials, had met with Messrs. Coco, Waller, Jortner, Brezner, R. R. Saunders and O. R.

Stephens, and Messrs. David Sheffield and B. C. Burnett, attorneys, in Alexandria, and entered into three contracts dated August 3, 1960, which are Plaintiff's Exhibits 4, 5 and 6 in C.A. 8166–A. I inquired of the Brown & Root, Inc., officials and the attorney Mr. St. Clair about the transactions of August 3, 1960 and was told about the negotiations as follows:

Brown & Root, Inc., advanced to Lake Pearl Sand & Gravel Company, Twenty Four Thousand Sixty Six and 01/100 Dollars ($24,066.01) to be paid to Stephens Gravel Company to bring current the mortgage payments on the sale of the Stephens-Big Rock pit. It was revealed by these contracts, for the first time to my knowledge, that Stephens Gravel Company had sold the Stephens-Big Rock pit to Central Sand & Gravel Company which was acting as an undisclosed agent and trustee for the individuals known as the Big Rock Group (consisting of Richard Coco, Ed Waller, Camille Gravel, Barnet Brezner, Al Jortner, George Connell, H. J. Quartermont, John W. Porter and J. W. Williamson) using funds that had been provided by the Big Rock Group through Cenla Century Concrete Products, Inc., another corporation owned by the same group. Big Rock Corporation had been formed by the Big Rock Group after the purchase of the Stephens-Big Rock pit from Stephens Gravel Company in the name of Central Sand & Gravel Company and after the award of the aggregate supply contract by Brown & Root, Inc., to Lake Pearl Sand & Gravel Company. By the agreement of August 3, 1960, Stephens Gravel Company substituted Big Rock Corporation for Central Sand & Gravel Company as the obligor on the purchase money note for the Stephens-Big Rock pit; Stephens Gravel Company agreed to dedicate the Stephens-Big Rock pit to performance of the aggregate supply contract; Big Rock Corporation leased the pit to Lake Pearl Sand & Gravel Company; the payments on the mortgage to Stephens Gravel Company were increased from $2,500.00 per

month to $5,000.00 per month; Big Rock sold Lake Pearl some stockpiled gravel for $24,066.01 (which Brown & Root had advanced to Lake Pearl) and Big Rock paid the $24,066.01 to Stephens Gravel Company; Big Rock and Lake Pearl agreed that the $5,000.00 per month payments to Stephens Gravel Company could be applied to the purchase money note or to amounts due O. R. Stephens personally for commissions on sales, overriding royalties reserved to him, or equipment rented from O. R. Stephens personally.

The original contract between Stephens Gravel Company and Central Sand & Gravel Company dated June 30, 1959, reserving rights to O. R. Stephens personally and making him a commission salesman for Central Sand & Gravel Company was attached to the contracts of August 3, 1960, and is Plaintiff's Exhibit 1, in C.A. 8166–A. Lake Pearl Sand & Gravel Company took over operation of the Stephens-Big Rock pit under the agreements of August 3, 1960.

Soon after examining the contracts of August 3, 1960 I visited with Richard Coco and asked for an explanation of the unusual corporate manipulations reflected in the August 3, 1960 contracts and why the Big Rock Group had conducted its business this way. Mr. Coco explained to me that R. R. Saunders actually controlled the Stephens Gravel Company through his position as the major creditor; that O. R. Stephens, although sole owner and president was sick and the business was being controlled by Mr. Saunders; that the principal customer of Stephens Gravel Company was Central company (the purchase order contract from Central Culvert to Stephens Gravel Company is referred to on page 5 of the Contract of Sale from Stephens Gravel to Central Sand, Plaintiff's Exhibit 1 in C.A. 8166–A); that Central Culvert was a subsidiary of Texas Industries, a corporation in the concrete and gravel business; that R. R. Saunders was a director of Texas Industries; that Cenla

Century Concrete Products, Inc. was in competition with Central Culvert in the ready mix concrete business; that if it were disclosed that Cenla Century Concrete Products, Inc., was buying the source from which their competitor Central Culvert obtained its sand and gravel, Mr. Saunders would block the sale; and that the Big Rock Group who were the owners of Cenla Century Concrete Products, Inc. used Central Sand & Gravel Company as its agent to make the purchase in order to conceal their interest from O. R. Stephens and R. R. Saunders. I was told by Mr. Coco that the original idea of purchasing the Stephens Gravel pit was for a source of supply for Cenla Century and not for a gravel operation to bid on the Old River Project, but that the Old River Project came up about the same time and that the possibility of that sale affected their plans to buy the Stephens-Big Rock pit. He told me that O. R. Stephens, Ed Waller and he, Richard Coco, attended the pre-bidding conference on the Old River Project. I knew from other sources, and from this information and the documents that:

| | |
|---|---|
| (1) The pre-bid conference was on | June 18, 1959 |
| (2) The sale of the Stephens Big Rock pit to Central Sand was on | June 30, 1959 |
| (3) The proposal from Central Sand to Brown & Root for aggregate was submitted on | July 17, 1959 |
| (4) The Old River Bid Date was | July 23, 1959 |

Mr. Coco further advised me that the money he invested in the Big Rock Group to purchase the Stephens Gravel Pit was supplied by Paul Lambert, of Lambert Gravel Company who had combined with St. Catherine Gravel Company in submitting a single proposal to Brown & Root, Inc.

Lake Pearl Sand & Gravel Company operated the Stephens-Big Rock pit from August 3, 1960 until November 2, 1960 and during this period supplied aggregate to the Old River Project. On November 2, 1960, operation of the Stephens-Big Rock pit was shut down because of lack of operating funds by Lake Pearl.

6. *Events of November 2, 1960*

On November 2, 1960 I attended a meeting in Alexandria, Louisiana, in the office of R. R. Saunders in his Chevrolet agency building, attended by O. R. Stephens and by Brown & Root's Project Manager, J. E. Quillen and Accountant, Mr. Hardee. This was the first time I had met O. R. Stephens or R. R. Saunders although Mr. Stephens had previously been identified to me from a distance in a grocery store or coffee shop in Alexandria. The purpose of the meeting was to discuss Brown & Root's decision to take over from Lake Pearl Sand & Gravel Company the operation of the Stephens-Big Rock pit under the terms of the contracts of August 3, 1960, because of the default by Lake Pearl and its inability to operate the pit. Agreement was reached that Brown & Root, Inc., had the right to take possession and operate the pit. However, O. R. Stephens and R. R. Saunders claimed that Lake Pearl was delinquent in payments on the mortgage at the $5,-000.00 per month rate and demanded that Brown & Root make an additional payment to bring the account current.

Brown & Root, Inc., operated the Stephens-Big Rock pit from November 2, 1960 until about February 18, 1961. Shortly prior to that date, Brown & Root, Inc., was able to purchase from St. Catherine Sand & Gravel Company, 21,225 cubic yards of gravel at $4.25 per cubic yard and sand at $5.50 per cubic yard from Lambert Gravel Company.

7. *Meeting of February 18, 1961*

Shortly before February 18, 1961 I telephoned David Sheffield, attorney for the Big Rock Group, and requested a meeting of all the members of the Big Rock Group to be held at the law office of Nauman Scott in Alexandria, Louisiana on February 18, 1961. The purpose of the meeting, as I explained it, was to discuss returning possession of the Stephens-Big Rock pit to the persons or corporation entitled to receive it, since Brown & Root no longer needed to operate the pit. The meeting was held as requested.

Present at the meeting for Brown & Root, Inc., were J. E. Quillen, Project Manager; and Nauman Scott and William A. Brown, attorneys. Present in response to my request for the Big Rock Group were: Messrs. Coco, Waller, Brezner, Connell, and O. R. Stephens, and David Sheffield, their Attorney and spokesman. David Sheffield announced that he represented everyone present except Richard Coco. Mr. Sheffield or his partner Camille Gravel had represented O. R. Stephens in the sale of the Stephens pit, in the contracts of August 3, 1960 and in other matters. O. R. Stephens said nothing that I remember at the meeting, but Mr. Sheffield spoke for the Group. Mr. Sheffield asserted that O. R. Stephens had certain equipment which he owned personally at the Stephens-Big Rock pit, but it was not itemized or identified, and that O. R. Stephens personally owned certain stockpiles of gravel located at the Stephens-Big Rock pit. Mr. Sheffield asserted that the lease to Lake Pearl Sand & Gravel Company had been terminated, but Richard Coco contested this. Mr. Sheffield stated that the Group would not receive back the Stephens-Big Rock pit as long as Brown & Root claimed any possible future need to receive gravel from the pit under the dedication provisions and demanded continued payment by Brown & Root, Inc., of $5,000.00 per month until all possible rights were released. Mr. Sheffield also asserted that if Brown & Root gave up possession of the pit it would be relinquishing all right to the stockpiles of aggregate owned by Brown & Root and paid for with funds advanced by Brown & Root to Lake Pearl on August 3, 1960.

No agreement was reached in the February 18, 1961 meeting.

8. *Claims by Creditors*

Numerous creditors of Big Rock Corporation and Lake Pearl Sand & Gravel Company presented claims and demands for payment to Brown & Root, Inc., following the November 2, 1960 default of Lake Pearl and takeover of the pit by Brown & Root. These claims were

numerous and large in total amount and asserted that Big Rock and Lake Pearl were subcontractors of Brown & Root, Inc., and that a lien existed against Brown & Root, Inc., and the Old River Navigation Lock or that the principal and sureties on the Miller Act Bond of Brown & Root, Inc., were liable to creditors of Lake Pearl and Big Rock Corporation. I was advised by Brown & Root accountants that Brown & Root had paid in full for all material received and had incurred expenses exceeding $100,-000.00 above the amount due under the aggregate supply contract in order to obtain an adequate supply of aggregate.

### 9. *Advice of Counsel*

Following the February 18, 1961 conference in the office of Nauman Scott, Mr. Scott and I conferred regarding the legal rights of Brown & Root, Inc., and the remedies available to recover the losses it had suffered and to protect it against further losses and liabilities. I related to Mr. Scott the facts stated above in this affidavit which were not previously known to him, and we together discussed the facts stated above in this affidavit which he knew first hand from his own investigation of public records and the documents mentioned and from his personal participation in conferences. Together we concluded that in our opinion as lawyers:

(1) That the identity of prices quoted for aggregate by the three bidders, St. Catherine, Central Sand and Guarisco (after changing its price to conform to the others) in the absence of a day-to-day market at the Old River Lock site, and considering obviously different production costs and delivery costs, indicated collusion among the bidders in violation of the anti-trust laws.

(2) That the corporate manipulations engaged in by the participants in the Cenla Century and Big Rock Group, the admitted practices of deception in purchasing the Stephens-Big Rock pit, and the complete dominance by the individuals of the corporations which they owned and controlled and the use of the cor-

porations to carry out their respective personal objectives, would justify a court in piercing the corporate veil and holding the participants personally liable for the acts of their corporations.

(3) That the commitments made by and on behalf of the members of the Big Rock Group before they formed the corporation and afterwards would justify holding the individuals liable jointly and individually for the liabilities of the group and any of the corporate entities used by the group.

(4) That the sale by Stephens Gravel Company of the Stephens-Big Rock Group to the Central Sand & Gravel Company, a competitor, substantially lessened competition for supply of sand and gravel from the deposits located in the Pollock area of geological formations capable of supplying aggregate meeting specifications of the Old River Lock, and violated the anti-trust laws.

(5) That because of the clandestine nature of most anti-trust conspiracies, it was difficult to know the identity of all participants in the anti-trust violations but that these charges should include O. R. Stephens because (a) he had participated personally with Ed Waller in two meetings with Brown & Root, Inc. (one in Houston) in an attempt to sell the aggregate on the proposal of Central Sand; (b) he had attended the pre-bid conference on the Old River Project with Ed Waller attempting to sell the aggregate on behalf of Central Sand; (c) he personally owned an overriding royalty and a sales commission contract on every yard of aggregate used by Brown & Root; (d) he was actively engaged in political efforts to get the Stephens-Big Rock pit approved as a source of aggregate; (e) he appeared as the controlling party in the entire relationship at each critical point of change, such as August 3, November 2 and February 18, because of his dominant financial interest as unpaid vendor of the Stephens-Big Rock pit; and (f) he was represented by the same attorney and repeatedly acted in concert with the members of the Big Rock Group.

(6) That all the parties, including O. R. Stephens, should be sued to declare and settle the correlative rights and obligations with respect to possession of the Stephens-Big Rock pit and to avoid continued accrual of the $5,000.00 per month obligation to O. R. Stephens and his corporation.

(7) That adjudication should be sought establishing that the aggregate supplier was not a subcontractor and that Brown & Root and its sureties were not liable under the Miller Act for unpaid creditors of the aggregate supplier.

I discussed these joint conclusions of Nauman Scott and myself, as attorneys for Brown & Root, Inc., with officials of Brown & Root, Inc., and I was instructed to commence preparation of a Complaint to accomplish these objectives and to continue efforts to divest Brown & Root, Inc., of possession of the Stephens-Big Rock pit.

Nauman Scott and I as attorneys for Brown & Root, Inc., prepared the Complaint and soon thereafter prepared the Bill in the Nature of Interpleader. As attorneys we jointly advised Brown & Root that in our opinion these pleadings were proper to accomplish the objectives stated, correctly expressed a claim for relief to which the Plaintiff was entitled on the basis of the facts as set forth herein and the applicable law and should be filed, and we recommended the institution of Civil Action 8166–A on the pleadings and against the Defendants named including O. R. Stephens. Brown & Root accepted this advice of counsel and authorized the filing of this suit.

### 10. *Interpleader and Miller Act Phases*

The Court divided Civil Action 8166–A into three separate phases on its own motion, namely: (a) Anti-Trust; (2) Interpleader; and (3) Miller Act. The Interpleader phase was disposed of first, then the Miller Act phase and finally the Anti-Trust phase. O. R. Stephens asserted claims in Civil Action 8166–A adversary to Brown & Root and other claimants in the Interpleader phase and asserted a counterclaim for wrongful seizure of his property. O. R. Stephens was awarded certain of the property deposited in the Court and he was, therefore, adjudicated to be a proper and necessary party to the suit. The Court ruled against most of the counterclaims asserted by O. R. Stephens in the Interpleader phase of the suit, but granted O. R. Stephens recovery of approximately $6,000.00 from Brown & Root, Inc., on one counterclaim. O. R. Stephens was a necessary party to Civil Action 8166–A and the prosecution of him in this suit has been adjudicated to have been proper and justified. There has been no arrest of the person of O. R. Stephens and no seizure of property of O. R. Stephens in Civil Action 8166–A, and these facts have been adjudicated.

Following adjudication of the Interpleader and Anti-Trust phases, I advised Judge Hunter and the defendants including O. R. Stephens, by letter of October 26, 1964 (page 1660 Record C.A. 8166–A) that Brown & Root, Inc., wished not to prosecute the Anti-Trust phase of the suit, and would not do so if the slander counterclaim were dismissed. O. R. Stephens refused to dismiss his counterclaim for slander in Civil Action 8166–A and, therefore, the Anti-Trust suit was prosecuted, not out of malice or spite, but solely as a defensive measure to establish probable cause for the suit against the defendants.

### 11. *Absence of Malice*

I did not know O. R. Stephens before the Old River gravel problems developed. I met O. R. Stephens only two times before Civil Action 8166–A was filed, first on November 2, 1960 in the office of R. R. Saunders to discuss taking possession of the Stephens Big Rock Pit, and second on February 18, 1961 in the office of Nauman Scott to discuss return of the Stephens Big Rock pit. On both occasions O. R. Stephens said little or nothing but merely listened to conversations conducted primarily by others. I do not recall any conversation with O. R. Stephens before the suit was filed except polite greetings and shaking of

hands. During the pendency of Civil Action 8166–A and this suit I have had no communication with O. R. Stephens except during trial, depositions or other proceedings in this case.

I have had no transaction personally with O. R. Stephens or any member of his family and I bear him no animosity.

No Brown & Root, Inc., official except J. E. Quillen and Robert Klossner had ever met O. R. Stephens, according to sworn admissions of O. R. Stephens and statements made to me by Brown & Root, Inc. officials. Relationships between J. E. Quillen and O. R. Stephens and between Robert Klossner and O. R. Stephens were cordial and friendly and not hostile according to statements made to me by Quillen before suit was filed, by Klossner before trial of Civil Action 8166–A, and by O. R. Stephens by deposition herein.

*Joinder of O. R. Stephens*

Some difficulty, as a lawyer, was encountered in preparation of the pleadings in CA 8166–A to develop appropriate remedies for all of the problems facing Brown & Root, Inc., and the concept of the Bill in the Nature of Interpleader by which the Stephens-Big Rock pit and the Miller Act Bond were deposited in the Registry of the Court was not fully developed at the time the Complaint was drafted and filed. Accordingly the Anti-Trust aspect of the case was filed first in the original Complaint, with only minor reference to the other aspects of the case, and the Bill in the Nature of Interpleader was filed shortly thereafter. All aspects of the proceedings were under consideration, study and preparation simultaneously. Mr. Nauman Scott and I worked together on the preparation of the pleadings. I prepared a first draft and Mr. Scott prepared the final form of the Complaint, and I prepared the first draft and the final form of the Bill in the Nature of Interpleader.

It was obvious from the outset of our preparation of the pleadings that O. R. Stephens was a necessary party to the litigation. He claimed title and right of possession of some of the property in

dispute and to which adverse claims were made in whole or in part, by some of the other parties to the suit. The respective positions of the various parties Defendant in relation to one another was not clear and changed from time to time during the period I was handling the matters. I had learned from experience that what appeared to be the relationship between the parties at one time turned out not to be the relationship asserted at another time, and relationships appearing in the public instruments turned out to be mere disguises for different relationships existing or which were claimed to exist on the basis of secret trust agreements, either written or oral. Noteworthy in this connection are the purchase of the Stephens-Big Rock Pit by the individuals investing in the Cenla-Century Concrete Products Company without revealing that the purchase by Central Sand and Gravel Company was an undisclosed trustee for the group which later formed Big Rock Corporation to hold title, and the undisclosed fact that Lambert Gravel Company provided part of the purchase money.

My recommendation that Brown & Root, Inc. allege violation of the anti-trust laws against the persons supplying aggregate to Brown & Root, Inc. was based on the facts described above, virtually all of which were admitted to be true by some or all of the Defendants at the trial of CA 8166 A. My recommendation that O. R. Stephens be joined in the anti-trust allegations, as well as the allegations involving the Interpleader-Property Other than Bond, and Miller Act phases, was based on the facts stated above, virtually all of which have been admitted to be true by some or all of the Defendants at the trial of CA 8166 A. I knew, or at least was informed, from the contracts, that O. R. Stephens received personally an overriding royalty and sales commission on every yard of aggregate supplied to Brown & Root, Inc. from the Stephens-Big Rock pit. I knew that he had personally undertaken, as salesman for Central Sand and Gravel Company, to make the sale of this aggregate from this pit to Brown

& Root, Inc., at the higher price initially quoted ($4.80 per cubic yard). I knew that he intervened and threatened to stop production from the Stephens-Big Rock pit unless some $24,000 was paid to O. R. Stephens personally in part and to Stephens Gravel Company as a creditor, and unless future installments were increased from $2,500 to $5,000 per month, and when these demands were met, he and his corporation agreed, as the other defendants had agreed to cooperate and to dedicate his plant and pit to performance of the aggregate supply contract. I knew that he acted in concert with the group, through a single attorney, in the February 18, 1960 meeting, in refusing to relieve Brown & Root, Inc. of possession of the pit, and in asserting various conflicting claims. I knew that O. R. Stephens was present and participating in a significant role in various actions involving the gravel supply and I believed that if a conspiracy to restrict competition or fix prices existed, O. R. Stephens was very likely to have participated in, or knowingly received the benefits of, the conspiracy. I considered that the effect of the sale of the Stephens Big Rock pit to the Big Rock Group was to substantially limit the available sources of aggregate for the Old River Project, and to violate the anti-trust laws, irrespective of scienter. After consultation with Mr. Nauman Scott, I drafted the petition with O. R. Stephens included as a defendant, without being instructed to do so by any Brown & Root, Inc. official, and I submitted the draft to the Brown & Root, Inc. officials with my recommendation and the recommendation of Mr. Scott that it be filed. I was given approval to do so without any specific discussion about O. R. Stephens as distinguished from the other Defendants.

From my personal handling of the aggregate supply problem I had more knowledge of the facts alleged in the Complaint and proved at the trial in CA 8188 A than any other person acting on behalf of Brown & Root, Inc. in the decision to file the suit and to join O. R. Stephens as a defendant. No Brown & Root, Inc. official participating in the decision had ever met O. R. Stephens or had any personal contact with the aggregate supply problem. Mr. Willis Powell, Vice President of Brown & Root, Inc. in charge of the Old River Project, and who had participated in the yearly transactions had died before CA 8166 A was filed. I have no knowledge today of any fact which was known to any Brown & Root, Inc. official prior to the filing of CA 8166 A which had not been made known to me prior to the filing of CA 8166 A; nor have I seen or heard any pleading or sworn assertion of any such fact.

/s/ William A. Brown

SUBSCRIBED and SWORN TO by the said WILLIAM A. BROWN, this 28th day of September, 1970.

/s/ Jane S. Cullen
Notary Public in and for Harris County, Texas

JANE S. CULLEN
Notary Public, in and for Harris County, Texas

My Commission Expires June 1, 1971